434 A.2d 1222

**Robert G. WITMER, Walter B. Slingerland, Larry Miller, Alexander Lauer, John W. Rintz, Francis J. Fritz and John J. Kunkel, Appellants,**

v.

**EXXON CORPORATION, Appellee.**

Supreme Court of Pennsylvania.

Argued April 22, 1981.

Decided Sept. 24, 1981.

542

Norman P. Zarwin, Martin J. Resnick, Philadelphia, for appellants.

E. Barclay Cale, Jr., Kell M. Damsgaard, John M. Phelan, Kell M. Damsgaard, Philadelphia, for appellee at Nos. 131 and 132.

William A. DeStefano, Philadelphia, for appellee at 80–3–566.

Before ROBERTS, NIX, LARSEN, FLAHERTY, KAUFFMAN and WILKINSON, JJ.

## OPINION

KAUFFMAN, Justice.

In separate equity actions consolidated here on appeal, appellants, seven gasoline service station dealers, challenged rental increases imposed by their common lessor, Exxon Corporation ("Exxon"), pursuant to express clauses in their retail service station leases.[1] Alleging that the clauses and the manner in which Exxon exercised its rental adjustment rights thereunder were (1) in violation of the Pennsylvania Gasoline Petroleum Products and Motor Vehicle Accessories Act ("Gasoline Act"),[2] (2) in breach of fiduciary duties allegedly owed by Exxon to appellants, and (3) "unconscionable," appellants sought orders directing Exxon to cease collecting the increased rentals, to return all collected rent increases and to negotiate in good faith to set mutually agreeable rentals. The Montgomery County Court of Common Pleas *en banc* sustained Exxon's demurrers, concluding on the undisputed factual record that each appellant had failed to state a cause of action, and dismissed the complaints. The Superior Court affirmed, 260 Pa.Super. 537,

---

1. Appellants are Robert G. Witmer, Walter B. Slingerland, Larry Miller, Alexander Lauer, John W. Rintz, Francis J. Fritz and John J. Kunkel. Appellee in each case is Exxon.

2. Act of November 26, 1975, P.L. 454, No. 126, § 1 *et seq.*, 73 P.S. § 202–1 *et seq.* The Gasoline Act "govern[s] the relationship between suppliers and distributors of gasoline and petroleum products and the dealers who sell the products to the public." 73 P.S. § 202–1.

394 A.2d 1276, we granted allocatur, consolidated this case for argument with *Exxon Corp. v. Wilson,* 495 Pa. 553, 434 A.2d 1229 (1981), and now affirm.[3]

The facts presented in each of these seven cases are substantially similar, and the issues involved and relief sought in each instance is the same.[4] The last executed leases between Exxon and appellants all were due to expire during the first half of 1977. Service station rentals set forth in the leases ranged from 1.53 to 1.9 cents per gallon of motor fuel delivered, with various monthly minimums ranging from $435 to $900. In several of these cases, however, the rents stated in the leases had been reduced to conform to federal controls imposed under the Economic Stabilization Act of 1970, and in all cases the rentals had been frozen at their May 15, 1973 levels by Federal Energy Administration ("FEA") regulations.

FEA rent controls were lifted at the end of December, 1975, and several months thereafter Exxon notified appellants Witmer, Slingerland, Fritz and Miller by letter that their rentals would be increased during their lease terms pursuant to a "rental reopener" clause in each of their leases. This clause expressly provided that, upon proper notice, Exxon could increase the service station rental by no more than one cent per gallon once during the term of the lease, and that if the lessee objected to a proposed rent increase and the parties failed to reach agreement within thirty days of the notice, lessee could terminate his obligations under the lease without liability.[5] In its letters to

3. Jurisdiction is vested in this Court pursuant to the Judicial Code, Act of July 9, 1976, P.L. 586, No. 142, § 2, 42 Pa.C.S.A. § 724(a).

4. Because demurrers were sustained in each of the cases, all well-pleaded facts must be taken as true.

5. The rental reopener clause provided as follows:

(2–A) *Rental Reopener Clause*: Exxon may give written notice of an intent to adjust or change the rental (and/or method of calculating the rental) Lessee is to pay for this lease specifying the effective date (which shall not be less than sixty days after the date of said notice) and the amount and other details of said adjustment. If the proposed adjustment or change is not satisfactory to Lessee, and

these four appellants, Exxon characterized the rent increases as steps in a gradual return to fair market rentals after nearly three years of artificial market depression due to the FEA controls. None of the appellants chose to terminate his lease, and Exxon began collecting the increased rentals.[6]

Near the end of each lease term, Exxon submitted proposed new leases to each appellant. The leases offered to Witmer, Slingerland, Fritz and Miller *proposed* rentals which were the same or slightly higher than those resulting from Exxon's implementation of the rental reopener clauses. Leases offered to Lauer, Rintz and Kunkel *proposed* rent increases which did not, on the average, represent as large a percentage increase over their last signed leases as did those of the appellants whose rentals had already been raised

Exxon and Lessee fail to reach agreement in that regard within thirty days after the date of said notice, then Lessee may terminate this lease upon written notice to Exxon as provided in article (1) above or upon such shorter time period as may be elected by Lessee. If within 60 days following the date of Exxon's notice Lessee has not elected to terminate this lease, then the rental adjustment or change proposed by Exxon shall become effective on the date specified in such notice.

Exxon's right to adjust or change the rent shall be limited as follows:

1. Exxon may not give notice of an adjustment or change until at least 90 days of the lease term shall have expired.

2. Exxon can give notice of a rent adjustment or change as provided in this Article (2) only once during the term of this lease specified above except that this provision shall not abridge or alter the rent adjustment procedures under Article (7) hereof in any way.

3. If Exxon should adjust or change the rent in a manner which results in a rent increase to Lessee, Lessee shall be under no obligation to pay Exxon a rental which exceeds by more than 1 cent per gallon the amount of rental which would be due under Clause two of the lease at the time the written notice to reopen is sent in accordance with the above (except insofar as an additional rental may be imposed to reflect the cost of additional investment in the premises pursuant to Article (7) hereof).

6. Although its notice to Witmer incorrectly imposed an increase of more than one cent during the lease term, Exxon reimbursed him for the excess collected when the error was brought to its attention. And although Exxon's notice to Miller was sent before 90 days of his lease term had expired, it subsequently reimbursed him to correct for this error. Exxon's compliance with the terms of the rental reopener clause, therefore, is not now at issue.

during the previous term. Without making any counterproposals, all seven appellants refused to execute the new leases, but none vacated the leased premises.

■ Despite an express provision in each lease that neither party had any obligation to renew or extend at the end of its term, Exxon chose not to commence ejectment proceedings, but instead advised each of the appellants by letter that it would consider his prior lease renewed by operation of law for one year.[7] Each lease provided for rental adjustment negotiations in the event of lease renewal by operation of law. If, after good faith negotiations, the parties were unable to agree upon rental terms for the renewal period, each lease further provided a formula for setting a maximum rental based on the market value of the property (as determined by an independent appraiser to be chosen by the lessee and acceptable to Exxon), property taxes, and Exxon's costs of maintenance and repair.[8]

7. When a lease for a term of years expires, and the lessee remains in possession, the landlord may at his option treat the lessee as a holdover tenant. *Pittsburgh v. Charles Zubik & Sons, Inc.*, 404 Pa. 219, 223, 171 A.2d 776 (1961).

8. The "extensions and renewals" clause read as follows:
"(3) Extensions and Renewals: In consideration of the granting of this lease, it is understood and agreed that *there shall be no contractual or other obligation on the part of either party to extend or renew this lease*: however, if this lease agreement should be extended or renewed by effect or operation of any law for any reason, it is understood and agreed that: (a) upon Exxon's giving written notice to Lessee of Exxon's intention to exercise its right under this section to adjust rentals, Exxon and Lessee *shall negotiate an adjustment of rental.* If no rental adjustment agreement is reached by the parties within 15 days after said notice, *Lessee shall be required at his expense to furnish to Exxon an appraisal of the premises* by a professional real estate appraiser acceptable to Exxon establishing the then market value of the premises based upon the highest and best use for the fee interest in said property without regard to the interest owned by Exxon or of the existence of this lease. The monthly rental thereafter, until otherwise adjusted hereunder, shall be $1/12$ of the sum of the following: (i) 10% of the appraised value of the fee interest in said premises, (ii) the total property taxes paid on the premises by Exxon in the preceding lease year, and (iii) Exxon's actual cost of repairs and maintenance performed on the premises during the preceding lease year. Such rental to be payable monthly in advance not later than the 10th day of each month during any

Exxon thereafter *proposed* rental adjustments under the extensions and renewals clauses which were the same as the rentals provided in the new leases previously offered. The rental adjustment was described by Exxon in letters to each of the appellants as "an increase which we propose," and each appellant's attention was expressly directed to the relevant language from the extensions and renewals clause mandating *negotiation* of rental adjustment and, failing agreement, providing the formula to be used to set the rental. None of the appellants, however, sought to engage in negotiations or to comply with the appraisal procedures.[9] Indeed, appellants' only response to Exxon's proposals was to commence the litigation now before us.[10]

## I

In the First Count of their Complaints, appellants allege that Section 3(c)(1) of the Gasoline Act imposes upon a franchisor an affirmative duty to negotiate with its franchisees for lease renewals, and that Exxon violated that section by failing to deal with them "in good faith."[11]

such renewal or extended term. The right to rental adjustment under this section shall be a reoccurring right, which may be exercised by Exxon at any time and from time to time after any extension of the term hereof by operation of law. (b) Exxon shall have the right and privilege, at its sole option to make additions, changes and amendments to the term of such renewal or extended lease and to the other covenants and provisions hereof or to substitute a new lease agreement all as Exxon may determine to be necessary or desirable." (Emphasis supplied)

9. Accordingly, the proposed increases became effective fifteen days after notice.

10. It is significant to note that appellants do *not* charge Exxon with any breach of contract. All technical errors made by Exxon in the implementation of rent increases were corrected by reimbursements to appellants.

11. Section 3(c)(1) provides:
(c) Nothing in subsection (b) shall prohibit *termination, cancellation or failure to renew*:
(1) if there is a failure on the part of the lessor supplier and the lessee dealer to agree upon the terms of a renewal agreement where both parties have acted in good faith in trying to effect such a renewal.... (Emphasis supplied)

548

However, Exxon's letters simply *proposed* rent increases and clearly *invited negotiations* by directly quoting relevant contract language providing that "Exxon and Lessee shall negotiate an adjustment of rental...."[12]  Rather than respond to this express invitation to negotiate by submitting a counterproposal, appellants unilaterally and unreasonably elected to construe Exxon's *proposal* as a "take it or leave it" bad faith effort to dictate rental terms.  Appellants thus chose to litigate rather than negotiate.

Moreover, the "good faith" requirement of Section 3(c)(1) may be invoked to state a cause of action under the Gasoline Act only where the oil company seeks to use expiration of the old lease to terminate its relationship with the lessee-dealer.  At no time, however, has termination either been sought or threatened by Exxon.  Nor, in fact, have appellants alleged that Exxon's actions constituted termination, either direct or indirect.[13]  Even were we to construe appellants' Complaints to imply the allegation that Exxon's rental *proposals* were so high that they would, if implemented as proposed, indirectly terminate their franchises by driving them out of business, appellants could not sustain a cause of action as of the time the complaints were filed.  If they anticipated financial hardship resulting from the *proposed* rent increases, it was incumbent upon them to bring this to Exxon's attention and attempt to exercise their contractual rights to negotiate.  Had appellants done so and met with unreasonable refusal to consider the effect of the proposed rentals on the fate of their respective businesses, this case would present a different profile.  Appellants'

12.  Exhibit "E" to Witmer, Slingerland and Miller Complaints; Exhibit "F" to Lauer Complaint; Exhibit "D" to Rintz, Fritz and Kunkel Complaints.

13.  The only reference in the Complaints which could possibly be stretched to constitute an accusation of attempted indirect termination appears in Count III, which is brought under a theory of "unconscionability" rather than under the Gasoline Act.  In that Count, each appellant makes the conclusional statement, without supporting factual allegations, that "[t]he economic impact of the terms dictated by [Exxon] and its method of enforcing such terms seriously endangers [appellant's] livelihood."

immediate requests for court intervention, however, were premature at best. As the Superior Court well stated, "... [I]t is not proper for appellants to seek equitable relief where they have failed to pursue their available contractual remedies." *Witmer, et al. v. Exxon Corp.*, 260 Pa.Super. 537, 556, 394 A.2d 1276, 1286 (1978).

## II

■ In Count Two of their Complaints, appellants allege sufficient facts to establish a franchisor-franchisee relationship with Exxon. *See Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978).[14] In *Razumic*, the Atlantic Richfield Company ("Arco") sought to terminate its dealership agreement without cause at the end of a three year lease term. Arco contended that the parties had contemplated an ordinary landlord and tenant relationship, terminable by either party upon expiration of the term of occupancy. Razumic argued that his "Dealer Lease," which did not confer upon Arco the right to terminate the relationship without cause, embodied a franchise agreement which Arco could not terminate at will. We held that the terms of Razumic's leasehold established a right of occupancy which could be terminated by Arco only if consistent with principles of good faith and commercial reasonableness.

■ The *Razumic* standards, however, are applicable *only* in the context of an attempt on the part of the franchisor to terminate its relationship with the franchisee. As we have noted, *supra*, the case before us does not involve a direct termination, nor do appellants allege that Exxon is seeking to use the *proposed* rent increases as a bad faith pretext to force them to abandon their franchises.

■ Even were this a case of direct or indirect termination, however, appellants could not sustain a cause of action under the *Razumic* standards of good faith and commercial

14. For example, appellants allege that Exxon: (1) licensed them to use its trademarks; (2) exercised strict supervision and control over the operation of their service stations; (3) dictated the products they could sell; and (4) benefited from their creation of good will.

reasonableness. In our recent decision in *Amoco Oil Co. v. Burns,* 496 Pa. ——, 437 A.2d 381 (1981), we distinguished from *Razumic* those cases where petroleum suppliers expressly have reserved the right to terminate franchise agreements with their dealers without cause. We noted that Burns' lease contained a clear and unambiguous provision permitting termination by either party without cause on proper notice at the end of the original or renewal term, and held that "... the duty of good faith and commercial reasonableness is used to define the franchisor's power to terminate the franchise *only when it is not explicitly described in the parties' written agreements.*" 496 Pa. at ——, 437 A.2d 384 (Emphasis supplied). In the present cases, the leases expressly reserve to each party the right not to renew the lease agreement at the end of the lease term. (See fn. 8, *supra* ).

We also note that in *Razumic,* we articulated the standard of good faith and commercial reasonableness for the purpose of protecting a franchisee's "reasonable expectations" in dealing with his franchisor. 480 Pa. at 378, 390 A.2d at 742. We thus held the *Razumic* standard inapplicable in *Burns* in light of the express provision in Burns' lease permitting termination without cause. The *Razumic* standard serves the valuable purpose of defining contractual relationships *which have been left unexpressed by the parties.* Here, appellants could not reasonably have expected nonenforcement of the rental adjustment clauses clearly expressed in their leases, particularly in light of the fact that service station rentals had for years been artificially depressed by federal rent controls. When controls were lifted, Exxon did no more than activate the procedures explicitly contemplated by the plain terms of those clauses.

## III

In Count Three, appellants allege that the rental adjustment clauses and the rent increases proposed thereunder were "unconscionable", and that Exxon therefore should be forced to roll back rentals and negotiate renewal leases,

presumably on terms more favorable to them. Exxon argues that the doctrine of unconscionability, as set forth in Section 2–302 of the *Uniform Commercial Code* ("Code"), 12A P.S. § 2–302, is inapplicable to the facts of this case and cannot, in any event, be used to obtain the relief sought by appellants.[15] Because we conclude, however, that the clauses here in question are neither unconscionable as written nor as applied, we need not reach the more general questions surrounding appellants' attempted use of the doctrine.

The classic and oft-quoted definition of "unconscionability" was articulated by the United States Court of Appeals for the District of Columbia Circuit in *Williams v. Walker-Thomas Furniture Company*, 350 F.2d 445 (D.C. Cir. 1965):

> Unconscionability has generally been recognized to include an *absence of meaningful choice* on the part of one of the parties together with contract *terms which are unreasonably favorable to the other party.*

350 F.2d at 449 (Emphasis supplied).

Appellants allege that Exxon was able to include the rental reopener clause in several of the leases because of its economic superiority. This Court and the federal courts in Pennsylvania, however, have refused to hold contracts unconscionable simply because of a disparity in bargaining power. *See e. g., Goldinger v. Boron Oil Co.*, 375 F.Supp. 400 (W.D.Pa.1974), *aff'd*, 511 F.2d 1393 (3d Cir. 1975); *K & C, Inc. v. Westinghouse Electric Corp.*, 437 Pa. 303, 263 A.2d 390 (1970).[16] Nor, in any case, could we conclude that the terms of the rental reopener clause are unreasonably favorable to Exxon. Exxon was not free under the clause to raise appellants' rents at its whim, but could do so only once

---

**15.** Exxon argues (1) that although the rental rates were related to the delivery of gasoline from Exxon to appellants, the issues in this case do not involve the sale of goods; and (2) that appellants seek improperly to use the doctrine as an equitable "sword", rather than as a defense to a contract claim.

**16.** Moreover, the Official Comment to the Code notes that the purpose of Section 2–302 is the "prevention of oppression and unfair surprise . . . and not of disturbance of allocation of risks because of superior bargaining power."

during the lease term and to a maximum of one cent per gallon. Appellants were thus assured of a maximum rental for their lease terms. And in this case, Exxon used the clauses merely to accelerate the return of appellants' rental to free market levels after years of artificial depression.

The extensions and renewals clause is no more than a means of protecting the interests of *all* parties in the event that the lease is renewed in a manner other than in the normal course of business.[17] It provides for negotiations in good faith when the lease is renewed by operation of law, just as if the old lease had expired and the parties were contemplating a new agreement. Appellants' theory of unconscionability, like their other legal theories, is based upon the contention that Exxon, rather than bargaining in good faith, attempted to force them to accept unfair contract terms. This claim, however, as we already have observed, is refuted by the fact that appellants' sole response to Exxon's invitation to negotiate was to rush prematurely to the courthouse.[18]

Accordingly, we conclude that the lower court properly sustained Exxon's demurrers and the Superior Court correctly affirmed.

Order affirmed.

O'BRIEN, C. J., did not participate in the consideration or decision of this case.

17. Similar clauses are found in many commercial leases, and have been reviewed and upheld by this Court. *See, e. g., Pittsburgh Allied Fabricators, Inc. v. Haber,* 440 Pa. 545, 271 A.2d 217 (1970).

18. The appraisal formula, provided in the clause as an alternative method of determining rentals in the event of failure to reach agreement, is described in appellants' Complaints as "even more outrageous" than Exxon's rental adjustment proposals, and its inclusion is cited as further "evidence" of Exxon's "bad faith." However, the formula, which in effect would provide Exxon with a ten percent yearly rate of return on its investment (*see* fn. 8, *supra* ), simply is a fallback to be employed *only after the failure of good faith negotiations.* We agree with the Superior Court that it is not on its face so obviously unfair or unreasonable as to excuse appellants' failure either to negotiate in good faith or to exercise their appraisal rights.