434 A.2d 1229

**EXXON CORPORATION, Appellee,**

v.

**Robert J. WILSON, Appellant.**

Supreme Court of Pennsylvania.

Argued April 22, 1981.

Decided Sept. 24, 1981.

Norman P. Zarwin, Martin J. Resnick, Philadelphia, for appellant.

E. Barclay Cale, Jr., Kell M. Damsgaard, John M. Phelan, Kell M. Damsgaard, Philadelphia, for appellee at Nos. 131 and 132.

William A. DeStefano, Philadelphia, for appellee at 80–3–566.

Before ROBERTS, NIX, LARSEN, FLAHERTY, KAUFFMAN and WILKINSON, JJ.

## OPINION

KAUFFMAN, Justice.

The issue presented by this appeal is whether a lessor oil company is entitled to regain possession of its gasoline service station from a lessee dealer who refuses to vacate

the premises at the expiration of his lease term despite failure of the parties, after extensive negotiations, to agree upon a new lease. Appellant, Robert J. Wilson, seeks to open a judgment in ejectment confessed against him by appellee, Exxon Corporation ("Exxon"), after he refused to vacate a leased gasoline service station at the end of the lease term. In his timely petition to open the judgment filed in the Court of Common Pleas of Montgomery County, appellant contended that Exxon had failed to negotiate a renewal lease in good faith and that termination therefore was in violation of Section 3(c)(1) of the Pennsylvania Gasoline Petroleum Products and Motor Vehicle Accessories Act ("Gasoline Act") [1] and in breach of fiduciary duties allegedly owed to him by Exxon. After depositions were taken and argument held, the court *en banc* entered an order refusing to open judgment. The Superior Court affirmed, 260 Pa.Super. 560, 394 A.2d 1288; we granted allocatur, consolidated this case for argument with *Witmer v. Exxon Corp., et al.,* 495 Pa. 540, 434 A.2d 1222 (1981), and now affirm.[2]

The last retail service station lease executed by Exxon and appellant, which expired on February 6, 1976, provided for a monthly rental of 1.7 cents per gallon of gasoline sold, up to 60,000 gallons, and one-half cent on each gallon over 60,000, with a minimum monthly rental of $1,050. Because of the Economic Stabilization Act of 1970, however, the rentals under the lease were modified to provide for payment of 1.5

1. Act of November 26, 1975, P.L. 454, No. 126, § 1 *et seq.*, 73 P.S. § 202–1 *et seq.* The Gasoline Act "govern[s] the relationship between suppliers and distributors of gasoline and petroleum products and the dealers who sell the products to the public," 73 P.S. § 202–1, and functions primarily to limit the circumstances under which an oil company may terminate its relationship with a lessee-dealer. Section 3(c)(1) provides:

> (c) Nothing in subsection (b) shall prohibit *termination, cancellation* or *failure to renew*:
> (1) if there is a failure on the part of the lessor supplier and the lessee dealer to agree upon the terms of a renewal agreement where both parties have acted *in good faith* in trying to effect such a renewal; (Emphasis supplied)

2. Jurisdiction is vested in this Court pursuant to the Judicial Code, Act of July 9, 1976, P.L. 586, No. 142, § 2, 42 Pa.C.S.A. § 724(a).

cents per gallon up to 60,000 gallons and one-half cent per gallon over 60,000, with a minimum rental of $810.00 per month.[3] Near the end of the lease term, Exxon submitted a proposed new lease to appellant which, while otherwise virtually identical to the old lease, contained a "rental reopener" clause authorizing Exxon to increase the service station rental by no more than one cent per gallon once during the term of the lease.[4] Anticipating the expiration of federal rent controls during the next term, appellant rejected Exxon's proposal, but did not vacate the premises.

Despite an express provision in appellant's lease that neither party had any obligation to renew or extend at the

3. Appellant's rental, as modified by the Economic Stabilization Act, had been frozen at May, 1973 levels by Federal Energy Administration regulations.

4. The proposed rental reopener clause provided:

(2–A) *Rental Reopener Clause*: Exxon may give written notice of an intent to adjust or change the rental (and/or method of calculating the rental) Lessee is to pay for this lease specifying the effective date (which shall not be less than sixty days after the date of said notice) and the amount and other details of said adjustment. If the proposed adjustment or change is not satisfactory to Lessee, and Exxon and Lessee fail to reach agreement in that regard within thirty days after the date of said notice, then Lessee may terminate this lease upon written notice to Exxon as provided in article (1) above or upon such shorter time period as may be elected by Lessee. If within 60 days following the date of Exxon's notice Lessee has not elected to terminate this lease, then the rental adjustment or change proposed by Exxon shall become effective on the date specified in such notice.

Exxon's right to adjust or change the rent shall be limited as follows:

1. Exxon may not give notice of an adjustment or change until at least 90 days of the lease term shall have expired.

2. Exxon can give notice of a rent adjustment or change as provided in this Article (2) only once during the term of this lease specified above except that this provision shall not abridge or alter the rent adjustment procedures under Article (7) hereof in any way.

3. If Exxon should adjust or change the rent in a manner which results in a rent increase to Lessee, Lessee shall be under no obligation to pay Exxon a rental which exceeds by more than 1 cent per gallon the amount of rental which would be due under Clause two of the lease at the time the written notice to reopen is sent in accordance with the above (except insofar as an additional rental may be imposed to reflect the cost of additional investment in the premises pursuant to Article (7) hereof).

end of its term, Exxon chose not to commence ejectment proceedings, but instead advised appellant by letter that it would consider his existing lease renewed by operation of law for one additional year until February 6, 1977.[5] The lease as so renewed provided that if, after good faith negotiations, the parties were unable to agree upon the rental for any renewal period, it would be set by the use of a formula based on the market value of the property (as determined by an independent appraiser to be chosen by the lessee and acceptable to Exxon), property taxes, and Exxon's costs of maintenance and repair.[6] During the renewal term, Exxon

5. When a lease for a term of years expires, and the lessee remains in possession, the landlord may at his option treat the lessee as a holdover tenant. *Pittsburgh v. Charles Zubik & Sons, Inc.*, 404 Pa. 219, 223, 171 A.2d 776 (1961).

6. The "extensions and renewals" clause read as follows:
  "(3) Extensions and Renewals: In consideration of the granting of this lease, it is understood and agreed that *there shall be no contractual or other obligation on the part of either party to extend or renew this lease*: however, if this lease agreement should be extended or renewed by effect or operation of any law for any reason, it is understood and agreed that: (a) upon Exxon's giving written notice to Lessee of Exxon's intention to exercise its right under this section to adjust rentals, Exxon and Lessee *shall negotiate an adjustment of rental.* If no rental adjustment agreement is reached by the parties within 15 days after said notice, *Lessee shall be required at his expense to furnish to Exxon an appraisal of the premises* by a professional real estate appraiser acceptable to Exxon establishing the then market value of the premises based upon the highest and best use for the fee interest in said property without regard to the interest owned by Exxon or of the existence of this lease. The monthly rental thereafter, until otherwise adjusted hereunder, shall be $1/12$ of the sum of the following: (i) 10% of the appraised value of the fee interest in said premises, (ii) the total property taxes paid on the premises by Exxon in the preceding lease year, and (iii) Exxon's actual cost of repairs and maintenance performed on the premises during the preceding lease year. Such rental to be payable monthly in advance not later than the 10th day of each month during any such renewal or extended term. The right to rental adjustment under this section shall be a reoccurring right, which may be exercised by Exxon at any time and from time to time after any extension of the term hereof by operation of law. (b) Exxon shall have the right and privilege, at its sole option to make additions, changes and amendments to the term of such renewal or extended lease and to the other covenants and provisions hereof or to substitute a new lease agreement all as Exxon may determine to be necessary or desirable." (Emphasis supplied)

notified appellant that federal controls had been lifted, and proposed rental increases under the extensions and renewals clause in stages to 1.69 and 1.89 cents per gallon of gasoline delivered, characterizing them as steps in a gradual return to fair market rentals after nearly three years of artificial market depression. Appellant made no counter proposal and refused to exercise his appraisal rights under the clause. Accordingly, the proposed increases became effective fifteen days after notice.

Approximately three months before the end of the renewal term, Exxon and appellant, who had retained counsel, commenced negotiations for a new lease. During the course of the extensive negotiations, Exxon not only agreed to eliminate the rental reopener clause it had proposed, but also offered to adjust its last rental proposal if appellant could demonstrate that it was disproportionate to the value of the premises or that it would impose a financial hardship.[7] Although he rejected Exxon's rental proposals as "outrageous," appellant refused to produce any of his financial records to substantiate his position. Because the parties failed to agree to terms for a new lease, Exxon, by letter dated February 24, 1977, gave notice to appellant to vacate the premises as of March 26, 1977. Despite the notice and despite the fact that it had found another prospective tenant who agreed to pay the rental proposed to and rejected by appellant, Exxon communicated its willingness to execute a new lease with appellant under any of its outstanding proposals and continued making new proposals until the very end.

On March 24, 1977, Exxon made a final attempt to achieve a compromise, offering a flat rental of $18,000 per year plus 0.8 cents per gallon purchased over 66,666 gallons per

7. Exxon offered appellant the opportunity to have the property independently appraised and to produce financial records to establish that the proposed rental would be disproportionate to the value of the premises or would impose a financial hardship in the operation of the business. That the premises were in a prime location is reflected by the fact that appellant's rental, which was based on gallons of gasoline sold, always exceeded the monthly minimum rental charges.

month.[8]  Appellant rejected this proposal, but refused to vacate the premises.  Exxon thereafter obtained the confessed judgment here at issue on March 28, 1977.

■  We conclude that appellant's petition to open the confessed judgment was correctly denied because the undisputed factual record leads inexorably to the finding that Exxon did not seek to terminate its relationship with appellant, but rather bargained with him in an honest and serious effort to reach a commercially reasonable accommodation.[9] By submitting no less than five different proposals, all of which were rejected by appellant, Exxon conscientiously and unambiguously sought to retain him as its lessee.  That the rent increases proposed were reasonable with respect to the economics of operating the service station is reflected, *inter alia*, by the fact that Exxon produced another tenant who would accept the terms appellant had refused and by the fact that appellant rejected Exxon's invitation to demonstrate either that the proposed rental would cause financial hardship or that it would be disproportionate to the value of the premises.[10]  To the very end, Exxon made every effort to keep open the possibility that appellant would accept its lease proposals, even after having given notice to vacate. Indeed, Exxon ultimately made a compromise proposal which would have permitted appellant to operate the service station at a *lower* rental than already had been offered by another.

**8.**  Exxon's previous proposal had been for a rental of $19,116 per year, and appellant's last offer had been $17,000 per year.

**9.**  We note further than since appellant's lease expressly reserved to each party the right not to renew at the end of the lease term, the standards enunciated in *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978) are inapplicable for the reasons expressed in *Witmer v. Exxon, et al., supra,* and in *Amoco v. Burns,* 496 Pa. ——, 437 A.2d 381 (1981).

**10.**  For the reasons stated in *Witmer v. Exxon, et al., supra,* we reject appellant's argument that the rental reopener clause originally proposed by Exxon or the extensions and renewals clause contained in the last executed lease were unconscionable.

■ To successfully challenge a confessed judgment, a petitioner must assert a meritorious defense. *Wenger v. Ziegler*, 424 Pa. 268, 226 A.2d 653 (1967). By establishing nothing more than the inability of two counselled parties to reach a new lease agreement after extensive good faith negotiations, appellant has not even come close. We refuse to permit the courts of this Commonwealth to intervene whenever negotiations between an oil company and a gasoline service station operator fail to produce mutually acceptable terms for a commercial lease.

■ Appellant next argues that the judgment should be opened under Pa.R.C.P. 2959(c) because the lower court should have submitted the issue of whether Exxon bargained in good faith to a jury.[11] We disagree. The undisputed factual record conclusively demonstrates that Exxon acted in good faith throughout the negotiations, and no reasonable jury could have reached any other conclusion. Consequently the trial court correctly resolved the issue as a matter of law. *See Fehr v. Campbell*, 288 Pa. 549, 137 A. 113 (1927).

Accordingly, the order of the Superior Court is affirmed.

O'BRIEN, C. J., did not participate in the consideration or decision of this case.

11. Pa.R.C.P. 2959(e) provides, in pertinent part:
"... If evidence is produced which in a jury trial would require the issues to be submitted to a jury the court shall open the judgment."