491 A.2d 138

**GERMANTOWN MANUFACTURING CO., Appellant,**

**v.**

**Robert J. RAWLINSON, Jr., and Joan Rawlinson, Appellees.**

Superior Court of Pennsylvania.

Argued July 19, 1984.

Filed March 29, 1985.

44

John T. Salvucci, Norristown, for appellant.

Robert B. Surakk, Philadelphia, for appellees.

Before CAVANAUGH, BECK and TAMILIA, JJ.

CAVANAUGH, Judge:

This is an appeal from the Order of January 19, 1983, by the Honorable Howard F. Reed, Jr. in the Court of Common Pleas of Delaware County, which granted appellee Joan Rawlinson's petition to Open a Confessed Judgment. We affirm.

The salient facts in this case are as follows. Robert G. Rawlinson was employed by The Germantown Manufacturing Company in Marple Township as its assistant controller. Over a period of twenty-one months, Mr. Rawlinson embezzled $327,011.22 from the company. On Friday, May 21, 1982, the company discovered the misappropriation. Mr. Rawlinson admitted his wrongdoing to the company controller, Mr. Harry Dinkel, and was fired. However, Mr. Rawlinson did not tell his wife about either the misappropriation of the company monies or the loss of his job until the following Monday, May 24, 1982. Sometime between Friday and Monday, Mrs. Joan Rawlinson, Robert's wife, answered a phone call for her husband from a Mr. Peter Kulaski who identified himself as an insurance adjuster. On Monday, May 24, 1982, she answered a second call for her husband from Mr. Kulaski. Sensing that something was amiss, she summoned her husband to the phone but stayed on an extension and overheard Mr. Kulaski say, "Have you told your wife yet?" At this, she hung up the phone, and when her husband had finished his conversation

she demanded to know what was going on. Mr. Rawlinson told his wife that he had lost his job because he had taken about $20,000.00 from the company. He also asked his wife if she wanted a divorce. Mrs. Rawlinson testified that upon hearing all of this, her "whole world fell apart." She also testified that because she had suffered a miscarriage in late April, she was already tired and depressed when she learned of her husband's malefactions.

The following day, Tuesday, Mrs. Rawlinson spoke by phone with Mr. Kulaski, who was a representative of the company's insurer, and learned that he was coming to the house "to discuss documents." He did not tell her he would attempt to have her co-sign two judgment notes. Nor did he tell her the amount her husband had misappropriated. Mr. Kulaski arrived later that day and spent thirty to forty-five minutes with Mr. and Mrs. Rawlinson. Mrs. Rawlinson apparently succeeded in keeping her two young children from knowing the purpose of the meeting.

The purpose of the meeting, from Mr. Kulaski's perspective, was to have Mr. and Mrs. Rawlinson sign two judgment notes. The first note was for $160,000.00—the amount Mr. Rawlinson admitted having taken. The second was for "any and all amounts in excess of One hundred and sixty thousand dollars ($160,000) which are determined by Affidavit of the President of Germantown Manufacturing Company, which Affidavit, when presented with this Note, shall constitute sufficient proof of a sum certain for the purpose of the Confession of Judgment contained herein." Both notes authorized any attorney to confess judgment in favor of Germantown Manufacturing against the Rawlinsons. Mrs. Rawlinson was surprised to see her name on the documents. She asked Mr. Kulaski if she and her husband would need an attorney. Mr. Kulaski calmly stated that if the Rawlinsons dealt in good faith and continued to cooperate, there would be no need for an attorney. Kulaski also stated that his principal was not interested in a criminal prosecution as long as Mr. and Mrs. Rawlinson cooperated.

Mrs. Rawlinson understood this to mean that if she signed the notes her husband would not go to jail.

Mrs. Rawlinson had never before seen a judgment note, and while she read them as best she could, she was crying for part of the time that she read them and believed that she was signing only one note for a total of $160,000.00. Mr. Kulaski told the Rawlinsons that since they had readily available assets totaling $160,000.00, the judgment was, in effect, already taken care of. She signed because she knew her husband had a check for $150,000.00 and the remaining $10,000.00 could be obtained without difficulty.

In August, Mr. Vernon Smith, the President of Germantown Manufacturing, completed the affidavit as required by the second note. The total amount owed on this note according to the affidavit was $212,113.21.

The first note, (for $160,000.00) has been satisfied. Mrs. Rawlinson's obligation as to it is not at issue. The only issue before us is whether the lower court abused its discretion in opening judgment on the *second* note.[1]

The opening of a confessed judgment is governed by well-settled principles:

> In order to open a confessed judgment, a party must act promptly, allege a meritorious defense, and present sufficient evidence of that defense to require submission of the issues to a jury.... A petition to open a judgment is an appeal to the equitable powers of the court and is addressed to the sound discretion of the court; a reviewing court will not reverse the determination of the lower court absent a clear and manifest abuse of discretion....
> The standard of sufficiency a court must employ is that of the directed verdict—viewing all the evidence in the light most favorable to the petitioner and accepting as true all evidence and proper inferences therefrom sup-

---

1. Despite the caption on this case, this appeal concerns only the opening of the judgment as to *Mrs. Joan Rawlinson,* appellee. The judgment we render will have no effect on Mr. Robert Rawlinson's obligation.

porting the defense while rejecting adverse allegations of the party obtaining the judgment.

*Weitzman v. Ulan*, 304 Pa.Super. 204, 209, 450 A.2d 173, 176 (1982).

■ Underlying our analysis in the instant case is the realization that "[a] warrant of attorney authorizing judgment is perhaps the most powerful and drastic document known to civil law.... The signing of a warrant of attorney is equivalent to a warrior of old entering a combat by discarding his shield and breaking his sword. For that reason the law jealously insists on proof that this helplessness and impoverishment was voluntarily accepted and consciously assumed." *Cutler Corporation v. Latshaw*, 374 Pa. 1, 4–5, 97 A.2d 234, 236 (1953). *See also Scott Factors, Inc. v. Hartley*, 425 Pa. 290, 228 A.2d 887 (1967). In analyzing the judgment notes in question, we are to be guided by the rules which apply to other written contracts. *W.B. Rambo Building and Loan Ass'n. v. Dragone*, 305 Pa. 24, 156 A. 311 (1931).

The lower court found that appellee, Joan Rawlinson, presented three meritorious defenses which permitted it to exercise its equitable discretion and open judgment. The three meritorious defenses are: 1) fraud and misrepresentation; 2) duress; and 3) the lack of accountability for the manner in which the appellant, Germantown Manufacturing, was permitted to arrive at the figure allegedly owed by the Rawlinsons. For the reasons we shall explain, we affirm the judgment of the lower court.

■ As one of the grounds for its decision to open judgment, the lower court found sufficient evidence of the meritorious defense of *fraud and misrepresentation*. In so holding, the lower court did not commit a clear and manifest abuse of discretion.

It scarcely seems necessary at this late jurisprudential hour in the day of *stare decisis* to cite cases to certify that fraud taints with illegality and invalidity anything its evil shadow darkens. Nor can there be any question of

the right of a court to set aside any contract which is founded on fraud. This is as fundamental and solidly established as the foundations of the courthouse.

*Iacoponi v. Plisko*, 412 Pa. 576, 581, 195 A.2d 362, 365 (1963).

■ The recipient of a misrepresentation may avoid the contract by showing that the misrepresentation was either fraudulent *or* material. E.A. Farnsworth *Contracts* 242 (1982); *See also DeJoseph v. Zambelli*, 392 Pa. 24, 139 A.2d 644 (1958). In the instant case, we find the misrepresentation to have been both fraudulent and material. Viewing the evidence in the light most favorable to Mrs. Rawlinson, the insurance company representative told the Rawlinsons that since they had $160,000.00 readily available, the judgment was, in effect, already satisfied. This statement clearly indicated to Mrs. Rawlinson that the limit of her liability and that of her husband was $160,000.00. However, the insurance man had her sign *two* notes, the first for $160,000.00 which is not at issue, and the second for any amount owing in excess of the first, which is the basis of this appeal. Her alleged liability under the second note was later determined by Germantown Manufacturing to be $212,113.21. Thus, Germantown Manufacturing and its insurer would now make Mrs. Rawlinson liable for over $372,000.00 notwithstanding the initial misrepresentation that the limit of her liability would be $160,000.00. If Mrs. Rawlinson's testimony is true, it taxes credulity to assume that the insurance representative was unaware of his deceit in having the innocent wife sign the second note. Even if he was in fact unaware, he "had means of knowledge from which [he was] bound to ascertain the truth before making the representation. Misrepresentations made under such circumstances *are* fraudulent...." *LaCourse v. Kiesel*, 366 Pa. 385, 390, 77 A.2d 877, 880 (1951). A statement uttered with such gross recklessness is deserving of the badge of fraud. In determining whether a misrepresentation is fraudulent, the Restatement (Second) of Contracts, § 162 distinguishes three types: The first type is where the maker of the misrepresentation knows or believes that the

assertion is not in accord with the facts. Viewing the evidence in the light most favorable to Mrs. Rawlinson, the insurance agent's statement illustrates this type of fraudulent misrepresentation. The second type involves a situation where the maker expressly or impliedly suggests that the statement is based on knowledge whereas he knows it is mere opinion. Thus, even if the agent had stated his true opinion, he would still have committed a fraudulent misrepresentation by suggesting his assertion was grounded in fact and based upon knowledge rather than mere opinion. The third type involves a situation in which the maker honestly believes his assertion but lies about its basis. For example, if the agent had impliedly suggested that his assertion was based upon a particular investigation, then he would have been lying about the basis of his assertion if there had been no such investigation. We have no evidence of this third type of fraudulent misrepresentation in the instant case. Of the three types of fraudulent misrepresentation, the first type (the maker knows or believes the assertion is not in accord with the facts) is the classic type often referred to as "fraud" since it is simply a lie asserted to induce assent by the other party. *See* J. Murray, *Cases & Materials on Contracts* 426 (3d ed. 1983). Our review of the record reveals that Mrs. Rawlinson presented sufficient evidence of this classic type of fraudulent misrepresentation to constitute a meritorious defense.

█ Even if the misrepresentation had not been fraudulent, the agreement may still be voidable because the misrepresentation was material. Where the misrepresentation is material, the party making the statement may believe his assertion to be true, and yet the agreement is voidable by the recipient as it induced him to manifest assent. "[T]he misrepresentation need not have been the sole or even the predominant" cause inducing one to assent, E.A. Farnsworth, *Contracts* 244 (1982) and "[t]he requirement of materiality is usually met by showing that the misrepresentation would have been likely to have induced a reasonable person to make the contract." E.A. Farnsworth, *Contracts* 243 (1982). Mrs. Rawlinson testified that she would not

have signed had she known the terms of the second note. Thus, the representation may be said to have induced her to sign.

■ While the lower court does not address it, it is also possible that still another type of fraudulent misrepresentation may be present here, fraud in the factum or execution. The effect of this type of fraud would be to render the contract *void*, not just *voidable*. A typical example of this involves a surreptitious substitution of one document for another and the innocent party signing it without knowledge or a reasonable opportunity to know the character or essential terms of the substituted document. Here, Mrs. Rawlinson believed she was signing one document with a maximum liability of $160,000.00. While there was no finding of fraud in the factum below, nor was this argued on appeal, we only note that such an argument would not have been frivolous.

■ The lower court further held that appellee presented sufficient evidence of *duress* to constitute a meritorious defense and thus render the contract voidable. We agree.

Pennsylvania appellate courts have given scant attention of late to this defense as applied to the situation now confronting us.[2] But other important authorities have afforded significant attention and scholarship to this question. E. Allan Farnsworth, who served as a Reporter for the Restatement of Contracts, Second, has written.

2. *Palatucci v. Woodland,* 166 Pa.Super. 315, 70 A.2d 674 (1950), the most recent case on point cited by appellant, bears a resemblance to the instant case. There, appellant, wife of a man who borrowed $1,600.00 from appellee, alleged that appellee threatened that if she did not sign a judgment note for $1,600.00, then he would have her husband arrested and prosecuted. The Superior Court quoted a 1912 case which stated: " 'Ordinarily, when no proceedings have been commenced; threats of arrest, prosecution, or imprisonment do not constitute illegal duress to avoid a contract ...' *Sulzner v. Cappeau-Lemley & Miller Co.,* 234 Pa. 162, 167, 83 A. 103, 105 ..." The court in *Palatucci* further stated that "[t]he doctrine of duress has broadened in modern times" but that the case in question still did not present a meritorious defense of duress because "if a threat to bring an action was made it did not preclude the opportunity to consult counsel before executing the note. There could be no duress where the contracting party is free to come and go and to consult counsel."

A threat to instigate criminal prosecution has generally been regarded as an improper means of inducing the victim of the threat to make a contract. The question ordinarily arises in the context of a threat to instigate prosecution for embezzlement unless the victim of the threat repays or promises to repay the sum allegedly embezzled. The victim of the threat may not be the alleged embezzler but his relative or friend. The impropriety lies in the use for 'private benefit ... of the criminal process of the court provided for the prosecution of the crime and the protection of the public.' On this ground, the threat is improper even if the person who makes it honestly believes that the one whose prosecution is threatened is guilty and even if in fact that person is guilty.

E.A. Farnsworth, *Contracts* 260 (1982).

The Restatement, Second, of Contracts states the following:

§ 175.  When Duress by Threat Makes a Contract Voidable

(1) If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim.

Restatement (Second) of Contracts § 175.

§ 176   When a Threat is Improper

(1) A threat Is improper if

\*   \*   \*   \*   \*   \*

(b) what is threatened is a criminal prosecution.

Comment c.  Threat of prosecution.

... An explanation in good faith of the criminal consequences of another's conduct may not involve a

*Palatucci,* 166 Pa.Super. at 320, 70 A.2d at 677. This differs from the instant case where appellee's option of consulting counsel before executing the note was not a viable one as such an action may have been deemed "noncompliance" by the appellant thus resulting in the prosecution of Mr. Rawlinson which appellee so dreaded.

threat. ... The guilt or innocence of the person whose prosecution is threatened is immaterial in determining whether the threat is improper, although it may be easier to show that the threat actually induced assent in the case of guilt. Illustrations:

4. A, who believes that B, his employee, has embezzled money from him, threatens B that a criminal complaint will be filed and he will be prosecuted immediately unless he executes a promissory note for $5,000.00 in satisfaction of A's claim. B, having no reasonable alternative, is induced by A's threat to sign the note. The note is voidable by B. ...

Restatement (Second) of Contracts § 176.[3]

The eminent contract scholars, Professors Corbin and Williston, had this to say on the subject:

Mere forbearance to prosecute or to come forward with evidence of a misdemeanor is not unlawful; but a bargain to exchange such a forbearance for a consideration is always unlawful. ...

The settlement agreement is made illegal only when a consideration is given in exchange for actual forbearance or for a promise of such forbearance.

6A A. Corbin, Corbin on Contracts § 1421 (1962).

The key factor is state of mind: was the victim's mind so beclouded by apprehension that he unwillingly signed a repayment or other note?

\* \* \* \* \* \*

3. At the 54th American Law Institute proceedings during which the sections of the Restatement, Second, of Contracts dealing with duress were discussed, a proposal was made to include a "good faith" exception to the rule. An example of the effect of this was also suggested: Neighbor A sees that neighbor B's home is in disrepair and is in danger of harming A's property. A threatens B with prosecution. B asks A to forbear prosecution and promises to repair the dangerous building in return for forbearance. It was suggested that the promise should be binding because it seeks to fulfill the goal of the criminal statute. Even had the exception been adopted, it would have no effect on the instant case as the appellee herself was surely not criminally liable for the embezzlement and the goal of the criminal statute would not be fulfilled by punishing *her*.

Experience indicates that the threat of a well-founded prosecution, likely to result in imprisonment, is usually sufficient to coerce even a brave man.

13 S. Williston, *Williston on Contracts* § 1613 (3d ed. 1970). *See also Falgiatore v. Falgiatore*, 378 Pa. 586, 107 A.2d 864 (1954); Calamari and Perillo, *Contracts* 265–67 (2d ed. 1977).

In the instant case, appellant took the unsolicited liberty of including Mrs. Rawlinson's name on the judgment notes and did not even tell her it was doing so until minutes before she was asked to sign them. Mrs. Rawlinson had already been in a weakened mental state as the result of a recent miscarriage, and was visibly upset during the meeting, having learned of her husband's malefactions. At the meeting, she was told that if she cooperated, she would have no need for legal counsel. She understood this to mean that if she signed the notes, her husband would not go to jail. She had no reasonable alternative but to sign. That Germantown Manufacturing was ready to carry out its threat is evidenced by the following letter from Germantown's attorney to the attorney subsequently retained by Mrs. Rawlinson.

Gentlemen:

I represent Germantown Manufacturing Company in connection with the wrongful conversion of $327,011.22 by Robert G. Rawlinson, Jr., of which $160,000.00 has been repaid. It has come to my attention that Mr. and Mrs. Rawlinson have retained both of you to remove and/or satisfy certain judgments by confession in the amount of $160,000.00 which were entered against the Rawlinsons in Pennsylvania and New Jersey within the last several months.

This letter will serve as notice to you and your clients that unless all efforts by you on behalf of the Rawlinsons to attack the judgments are withdrawn and discontinued on or before 3:00 p.m. on Friday, August 13, 1982, I have been authorized to present the information and evidence in our possession to the appropriate prosecutor's office

for criminal action. Failing to receive such proof shall be treated as a refusal by the Rawlinsons to cooperate further and pay the entire debt.

Appellee's admission that Mr. Rawlinson actually took the funds does not harm and may even strengthen her defense of duress as "it may be easier to show that the threat actually induced assent in the case of guilt." Restatement (Second) of Contracts § 176 comment c. Moreover, the fact that Mr. Kulaski did not threaten "imminent" arrest should be of no concern in the present analysis. 13 S. Williston, *Williston on Contracts* § 1613 (3d ed. 1970). Nor should it matter if the threat of prosecution was not *expressly* stated. "[T]he bargain is just as illegal when the agreement is implied as when it is express." 6A A. Corbin, *Corbin on Contracts* § 1421 (1962).

Furthermore, we note that agreements not to prosecute have been called "emphatically illegal." Although the law will leave parties who are in *pari delicto* where it finds them, *see* J. Murray, *Murray on Contracts* § 346 (2d ed. 1974), "[a] party who is pressured into an illegal bargain by duress is deemed not to be equally guilty with the party exercising the pressure...." Calamari and Perillo *Contracts* 266–67 (2d ed. 1977). Thus, this defense will not be barred. It is an affront to our judicial sensibilities that one person's ability to seek another's prosecution can be bartered and sold the same as commodities in the market place. It is even more repugnant when the foul stench of oppression pervades the transaction.

It is clear beyond peradventure that the "choice" available to Mrs. Rawlinson exuded impermissible coercion. We note that appellee's status as *spouse* to the alleged embezzler, though not argued as such by appellee, lends credence to our finding of duress in the instant case. Mrs. Rawlinson signed the documents presented her believing that her cooperation was necessary to keep her husband from going to jail. We dare not lend our judicial imprimatur to a transaction which holds the institution of the family in such lowly regard. Just as "courts will not enforce an agree-

ment that tends unreasonably toward dissolution of a marriage", E.A. Farnsworth, *Contracts* 344 (1982), neither should we enforce the second note. The only alternative for a reasonable party in the position of Mrs. Rawlinson was to refuse to sign and thus place an almost assuredly unbearable stress on her marriage and on the tranquility of the Rawlinson household. This is the epitome of duress.

A mutually exclusive basis for our holding in this case is found in the concept of *unconscionability*. Though the appellee does not argue this defense by name, she does aver the elements of unconscionability—that the terms of the second note were not manifested in a fashion reasonably comprehensible to her and that she had no reasonable choice but to sign; thus an analysis of this doctrine is appropriate.[1]

■ "Unconscionability" is a defensive contractual remedy which serves to relieve a party from an unfair contract or from an unfair portion of a contract. *See* D. Dobbs, *Handbook on the Law of Remedies*, 707 (1973). The unconscionability section of the Uniform Commercial Code (*see* 13 Pa.C.S. § 2302) has been called "one of the most innovative sections" in the Code, a section which Karl Llewellyn, Chief Reporter of the Code described as "perhaps the most valuable ... in the entire Code.'" E.A. Farnsworth, *Contracts* 307 (1982) (citation omitted). "Perhaps the most durable dictum on the meaning of 'unconscionability' is that of the court in [*Williams v. Walker-Thomas Furniture Company*, 350 F.2d 445, 449 (D.C.Cir.1965)]: 'Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" E.A. Farnsworth *Contracts* 314 (1982). *See Beckman v. Vassall-Dillworth Lincoln Mercury*, 321

4. The defense of unconscionability does not yet have the same long-standing historical legitimacy enjoyed by other methods of avoiding a contract such as mistake, duress, fraud and misrepresentation. It is also not yet as clearly defined as these traditional defenses. *See* E.A. Farnsworth Contracts 310 (1982); D. Dobbs, *Handbook on the Law of Remedies* 708 (1973).

Pa.Super. 428, 468 A.2d 784 (1983), *Witmer v. Exxon Corp.*, 495 Pa. 540, 434 A.2d 1222 (1981). The unconscionability defense has been extended beyond the code to non-sale of goods cases. *See* Restatement (Second) of Contracts § 208. The underlying rationale for this remedy is closely related to the rationale underlying fraud. The Supreme Court of our sister state of New Jersey has recognized that the purposes which both remedies were designed to serve are inextricably linked.

> The standard of conduct contemplated by the unconscionability clause is good faith, honesty in fact and observance of fair dealing. The need for application of this standard is most acute when the professional seller is seeking the trade of those most subject to exploitation— the uneducated, the inexperienced and the people of low incomes. In such a context, a material departure from the standard puts a badge of fraud on the transaction and here the concept of fraud and unconscionability are interchangeable.

*Kugler v. Romain,* 58 N.J. 522, 544, 279 A.2d 640, 652 (1971). Unconscionability and the other methods of avoiding an unfair contract examined herein do nothing more than reaffirm the most basic tenet of the law of contracts— that parties must be free to choose the terms to which they will be bound.

In deciding whether a contract, or a portion thereof, is unconscionable, the following analysis is useful.

> Parties to a contract rarely consciously advert to any number of terms which are binding upon them. If such terms allocate the risks of the bargain in a manner which the parties should have reasonably expected, they are enforceable—they are, to use the expression of Karl Llewellyn, 'decent' terms. If the terms of the contract suggest a reallocation of material risks, an attempted reallocation may be so extreme that regardless of apparent and genuine assent, a court will not enforce it.... The parties will not be found to have agreed to an abnormal allocation of risks if the only evidence thereof is

an inconspicuous provision in the boilerplate of the standard form. At a minimum, the reallocation must be physically conspicuous. Beyond that, it must have been manifested in a fashion comprehensible to the party against whom it is sought to be enforced. Finally, such party must have had a reasonable choice in relation to such reallocation.

J. Murray, *Murray on Contracts § 353 (2d ed. 1974)*.

In the instant case, there can be no question but that the confession of judgment clause was the essence of a material, risk-shifting term. It was designed to summarily discard the due process guarantees which our system of jurisprudence so highly cherishes. It is difficult to conceive of a clause which alters risks in a more drastic fashion than one which dispenses with the signer's day in court. The signer has lost the lawsuit before it has begun.

Perhaps confession of judgment clauses are so pernicious that they should be declared illegal. In the absence of illegality, however, the only concern of the court should be whether the party against whom the clause is supposed to operate knew about it and once his apparent assent is manifested, whether he had any choice at all in relation to it, i.e., whether the apparent assent is genuine.

J. Murray, *Unconscionability: Unconscionability*, 31 U.Pitt.L.Rev. 1, 19–20 (1969).

The first concept of unconscionability which we shall examine may be classified under the rubric of *"unfair surprise."* This type of unconscionability involves contractual terms which are not typically expected by the party who is being asked to "assent" to them. An unexpected clause often appears in the boilerplate of a printed form and, if read at all, is often not understood. By signing such a form, a party is bound only to those terms which such party would reasonably expect such a printed form to contain. If the form contains a material, risk-shifting clause which the signer would not reasonably expect to encounter in such a transaction, courts have held that the clause may be excised as it is unconscionable. *See Hen-*

*ningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960); *Jones v. Star Credit Corp.*, 59 Misc.2d 189, 298 N.Y.S.2d 264 (1969). This type of unconscionability is typically found only in consumer cases and courts have exhibited some reluctance to apply it in cases dealing with merchant-to-merchant contracts.[5]

> A court must determine what a particular party, in the context of the particular transaction, reasonably expected beyond the "dickered" terms. Unread terms in the form that are consistent with that expectation should be operative; those that are inconsistent should be inoperative. The conspicuousness of the print as well as the character of the document should be considered.

J. Murray, *The Standardized Agreement Phenomenon in the Restatement (Second) of Contracts*, 67 Cornell L.Rev. 735, 776 (1982).

■ In the instant case, Mrs. Rawlinson did not understand the terms of the second judgment note. The harsh allocation of risks was not manifested in a manner reasonably comprehensible to her. She had never before seen a judgment note and was crying for part of the time when she read the documents presented to her, although she tried her best to read them. The lack of real choice inherent in the transaction may have counselled against any need to thoroughly read and understand what she was signing. Furthermore, neither the insurance agent nor her husband offered her any guidance as to the extent of the liability to which she was agreeing. In fact, she was misled as to her liability. *See our discussion of fraud and misrepresenta-*

5. *But see K & C, Inc. v. Westinghouse Electric Corp.*, 437 Pa. 303, 263 A.2d 390 (1970) a case dealing with a merchant-to-merchant contract: Here the loss is commercial.... Although we need not decide whether any exclusion of consequential damages where the loss is commercial can be unconscionable ..., it is clear that the exclusion was not unconscionable here, where the buyer was hardly the sheep keeping company with wolves.
*See also Johnson v. Mobil Oil Co.*, 415 F.Supp. 264 (E.D.Mich.1976), which discusses *K & C, Inc. v. Westinghouse Electric Corp.*, *supra*. Modern courts recognize that the signer may be theoretically and technically a merchant but functionally a consumer in terms of education, business acumen, and experience.

*tion, supra.* Therefore, the confession of judgment clause is "no more part of the agreement entered into than the advertisements on the walls of the room in which the contract is signed." *Cutler v. Latshaw,* 374 Pa. 1, 7, 97 A.2d 234, 237 (1953).

Mrs. Rawlinson has not manifested even "apparent" assent here. But even assuming that she read and understood the confession of judgment clause in all of its star-chamber ramifications, she did not *genuinely* assent to it because the clause was *adhesive.* The second concept of unconscionability which we shall examine concerns clauses wherein there is *apparent* but not *genuine* assent. *See* Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contracts,* 43 Colum.L.Rev. 629 (1943).

The second concept of unconscionability has nothing to do with awareness of the terms of the contract. Assume the unusual situation of the party who reads and understands every scintilla of the printed form. He signs this document as the exclusive evidence of the deal. All courts admit evidence of misrepresentation, fraud, or duress to vitiate this apparent contract. Similarly, evidence of interference with the bargaining process falling short of these startling possibilities will also permit a court to refuse to enforce the contract or a part of the contract. The party who requires goods or services important to his physical or economic well-being may have little or no choice but apparently to assent to the terms of a printed form dictated by the party with superior bargaining power. Even where other sources of supply are available, there may be conscious parallelism resulting in virtually identical printed forms offered by all available suppliers. The phrase "contract of adhesion" and the evil it suggests have been familiar for many years. The terms of these contracts do not surprise the weaker party because they were read and understood—perhaps even explained by the dictatorial supplier. Assent and volition and, therefore, agreement are absent. The weaker party should not suffer the hardship that such clauses create.

For this type of unconscionability, that the clauses are printed on standard forms is irrelevant. Presumably, the clauses are as clearly understood as they would be in the form of a personal letter or telegram. The difficulties that courts must confront in determining whether a particular clause is oppressive can be enormous. For example, a court must determine whether a party had any genuine choice, whether there was gross disparity in bargaining power, and the like. The problems should not be exacerbated, however, by confusing unconscionability because of unexpected terms with unconscionability due to a lack of choice.

J. Murray, *The Standardized Agreement Phenomenon in the Restatement (Second) of Contracts*, 67 Cornell L.Rev. 735, 776–77 (1982). In the instant case, it is difficult to conceive of a greater lack of choice than that which faced Mrs. Rawlinson (*see our discussion of duress, supra* ). We will not bind her to clause to which she could not refuse her "assent".

Finally, the lower court held that an accounting is necessary to raise the second note above mere conjecture, surmise, or speculation. The absence of such an accounting, according to the lower court, constitutes a meritorious defense. When Mrs. Rawlinson signed the second judgment note, no amount was printed therein. Nor was there an affidavit attached stating the amount owed as the extent of Mr. Rawlinson's embezzlement was not then known to Germantown. The note authorized the President of Germantown to determine the amounts owed and to set forth such information in an affidavit. Though it did not say so expressly, the second note did not authorize the President to arbitrarily designate any amount he desired on a whim. Rather, the only amount which he could set was the amount actually determined to have been embezzled (above the amount satisfied by the first note). "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." Restatement (Second) of Contracts § 205. As Justice Cardozo once wrote: "The law has outgrown its primitive stage of formalism when the

precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed." *Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 91, 118 N.E. 214, 214 (1917) (citation omitted). We therefore imply the promise on the part of Germantown to act in good faith in determining and setting the amount owed. When Germantown's president filled in the amount allegedly owed on the face of the affidavit as required by the second note, included therein was over $45,000.00 in interest on the principal. Even assuming that Mrs. Rawlinson assented to the terms of the second note without fraud, misrepresentation, duress, or unconscionability interfering with her ability to choose, we cannot say that she agreed to pay interest on the principal, and so Germantown's inclusion of it in the affidavit may have been a breach of its duty to act in good faith. Thus, we hold that it constitutes a meritorious defense.

For these reasons, we affirm the lower court's order opening the judgment.