# Decker v. Nationwide Insurance Company

148

*Jill H. Miller,* for plaintiffs.

*James C. Haggerty* and *Mary C. Doherty,* for defendant Nationwide.

*Charles E. Haddick Jr.* and *Bryon R. Kaster,* for defendant Robert G. Turano Insurance Agency.

MINORA, *J.,* April 16, 2007—The instant issue before the court is the motion for summary judgment filed by defendant Nationwide Mutual Insurance Company. Two separate complaints were filed at captions 05 CV 1863 and 06 CV 2119. The court has elected to address these complaints separately. This motion for summary judgment was filed in response to plaintiffs' second amended complaint at 05 CV 1863. The relevant facts are as follows.

On or about February 13, 2004, the plaintiff, John Decker, was seriously injured in a motor vehicle collision caused by the negligence of Willard Shepard. Shepard was operating a vehicle owned by Frank Collins. Mr. Decker was operating a state police cruiser owned by the Commonwealth of Pennsylvania.

At the time of the accident, the Collins vehicle was insured by State Farm Insurance Company, with body liability protection in the amount of $50,000. Mr. Decker settled all claims against Mr. Shepard and State Farm Insurance Company with the knowledge and consent of the defendant. All agree that the policy limits of State

Farm Insurance Company were not adequate to compensate plaintiffs for the injuries sustained by plaintiff John Decker in the accident.

At the time of the accident, plaintiff John Decker was a named insured under Nationwide Insurance Company, policy number ***********. Plaintiffs' second amended complaint at ¶10. The policy was issued by defendant Nationwide to plaintiffs on July 31, 1996. See plaintiffs' complaint at caption 06 CV 2119, ¶9. The Deckers purchased the policy from defendant, Robert G. Turano t/d/b/a Robert G. Turano Insurance Agency, an authorized agent or employee of Nationwide. At the time Turano initially sold the policy to the Deckers, they told Turano that Mr. Decker was employed full-time as a Pennsylvania State Police Trooper, and therefore he knew the circumstances of Decker's employment, *i.e.,* that plaintiff John Decker was required to operate a state police cruiser as a mandatory condition of his employment. Turano also knew the state police cruiser motor vehicle regularly used by Decker was non-owned by him, *i.e.,* owned by the Commonwealth of Pennsylvania.

Plaintiffs had specifically elected to purchase the optional uninsured/underinsured motorist (UM/UIM) benefits, as reflected in their declaration sheet and their higher premium paid. Insurance companies are required to offer such optional coverage as mandated by the Pennsylvania Motor Vehicle Financial Responsibility Law (Pa.MVFRL), specifically, 75 Pa.C.S. §1731. The text of the 75 Pa.C.S. §1731 is provided as follows:

*"Availability, scope and amount of coverage*

"(a) *Mandatory offering.*—No motor vehicle liability insurance policy shall be delivered or issued for delivery in this Commonwealth, with respect to any motor vehicle registered or principally garaged in this Commonwealth, unless uninsured motorist and underinsured motorist coverages are offered therein or supplemental thereto in amounts as provided in section 1734 (relating to request for lower limits of coverage). Purchase of uninsured motorist and underinsured motorist coverages is optional.

"(b) *Uninsured motorist coverage.*—Uninsured motorist coverage shall provide protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of uninsured motor vehicles. The named insured shall be informed that he may reject uninsured motorist coverage by signing the following written rejection form:

"Rejection of Uninsured Motorist Protection

"By signing this waiver I am rejecting uninsured motorist coverage under this policy, for myself and all relatives residing in my household. Uninsured coverage protects me and relatives living in my household for losses and damages suffered if injury is caused by the negligence of a driver who does not have any insurance to pay for losses and damages. I knowingly and voluntarily reject this coverage.

_____

"Signature of first named insured

_____

"Date . . .

"(c) *Underinsured motorist coverage.*—Underinsured motorist coverage shall provide protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therfor from owners or operators of underinsured motor vehicles. The named insured shall be informed that he may reject underinsured motorist coverage by signing the following written rejection form:

"Rejection of Underinsured Motorist Protection

"By signing this waiver I am rejecting underinsured motorist coverage under this policy, for myself and all relatives residing in my household. Underinsured coverage protects me and relatives living in my household for losses and damages suffered if injury is caused by the negligence of a driver who does not have enough insurance to pay for all losses and damages. I knowingly and voluntarily reject this coverage.

_____

"Signature of first named insured

_____

"Date . . . "

Plaintiffs' motive for seeking UM/UIM coverage is obvious. Plaintiff John Decker, as a trooper of the Pennsylvania State Police, spent long hours of employment within his police cruiser on highway patrol.

The policy provided, inter alia, underinsured motorist protection in the amount of $100,000. Invoice-type documents entitled "declarations," memorializing the policy renewals and nature of coverage for the time in question and the year preceding plaintiff's accident, indicate the policy was renewed bi-annually. See plain-

tiffs' brief in opposition to the motion for summary judgment of defendant, Nationwide Mutual Insurance Co., exhibits 4, 5, 6. The declarations included the following renewal periods for plaintiffs' insurance policy leading up to and including plaintiff John Decker's accident:

*(a) January 29, 2003—July 29, 2003*

*(b) July 29, 2003—January 29, 2004—term immediately preceding the accident*

*(c) January 29, 2004—July 29, 2004—term during which the accident occurred*

We again note that plaintiff's accident occurred on February 13, 2004, approximately two weeks into the new term of the plaintiffs' modified policy renewal.

On September 14, 2004, plaintiff informed defendant Nationwide that he was making a claim for UIM benefits under the Nationwide policy and subsequently provided Nationwide with documentation to support his claim for underinsured motorist benefits. Plaintiff demanded that Nationwide tender its policy limits of $100,000. On November 30, 2004, after getting no response from Nationwide to their demand for the policy limits, Mr. Decker demanded arbitration of his underinsured motorist claim. He appointed Lawrence J. Moran, Esquire to be his arbitrator, and requested that Nationwide appoint its arbitrator. Having again received no response from defendant Nationwide with regard to his demand for arbitration and request for defendant to appoint its arbitrator, on January 15, 2005, Plaintiff presented a petition for appointment of defense and neutral arbitrators in the Court of Common Pleas of Lackawanna County.

Defendant, through a letter dated April 8, 2005, informed plaintiffs' counsel that "Nationwide is denying coverage for the underinsured claim you have made on behalf of Mr. Decker. The Nationwide policy language was previously provided to you on January 26, 2005. . . . Pursuant to the terms of the policy language, underinsured motorist coverage does not apply to:

"bodily injury to you or a relative *using a non-owned motor vehicle that is available for regular use by you or a relative.*" (Hereinafter referred to as the "regular use exclusion,"), plaintiffs' second amended complaint at ¶16. (emphasis added)

This language was added to the policy through a six-page "summary of changes" document that included headings in larger, bold-face type, with a bulleted, single-spaced list itemizing the various changes and amendments. Attached hereto as exhibit "A". Defendant Nationwide provided the summary of changes document to plaintiffs in a mailing dated January 5, 2004. See defendant Turano's answers to interrogatories, at ¶17, attached as exhibit "2" to plaintiff's brief in opposition to defendant Nationwide's motion for summary judgment. The language pertaining to the regular use exclusion limiting plaintiffs' UM/UIM coverage was discretely included on page (4) of (6) of the document. The summary of changes includes separate headings for each of these two categories, uninsured and underinsured. The language accompanying each of the headings is identical. There is no language in the summary of changes using the phrase "regular use exclusion." The language this court deems as summarizing the "regular use exclusion" is

found under the third bulleted phrase under the respective headings, with emphasis added by the court:[1]

*"Uninsured Motorists (pages U1 to U5)*

• Under coverage exclusions, we have:

o Amended exclusion 1 to more clearly identify the types of uses we do not intend to cover, such as delivery of pizza, newspapers and mail.

o Added further clarification to exclusion 4 that coverage is excess when WC benefits are paid or payable.

o Added exclusion 9, prearranged or organized events and *exclusion 10, use of a non-owned vehicle that is available for use by the policyholder, spouse or relative.* . . ." See exhibit "A," summary of changes, at 4. (emphasis added)

The "summary of changes" cover page highlights a few of the changes the document includes, apparently those defendants thought noteworthy. We note the cover page does highlight *one* policy change, affecting coverage for rural mail carriers:

"One important change with this renewal is the elimination of coverage for vehicles used by rural route mail carriers. If you are a rural route mail carrier or use your vehicle to haul people or property for a fee we urge you to discuss this immediately with your agent so they can properly advise you of your options." See exhibit "A," summary of changes document, at cover page.

---

1. We have attempted to replicate the font used in the "summary of changes" document. [not replicated here]

Notably, there is no language whatsoever included on the cover page to the summary of changes to alert insureds to another, much broader category of exclusions of a similar nature that practically eliminates UM/UIM coverage: the regular use exclusion. The regular use exclusion of this policy arguably functions to suspend coverage for any insured operating a vehicle owned by his or her employer and regularly used by the employee during the course of employment.

The dispute currently between the parties concerns the policy coverage active at the time of the accident as it differs significantly from the coverage in the immediately preceding policy that expired just two weeks before plaintiff John Decker's accident. Despite Turano and Nationwide's knowledge of plaintiff John Decker's employment as a Pennsylvania State Trooper and the State Police Department's mandatory employment requirement that said plaintiff regularly operate a state police cruiser owned by the Commonwealth of Pennsylvania, defendant Turano never informed the Deckers of the regular use exclusion. Similarly, Turano never informed the Deckers of the regular use exclusion, despite knowing plaintiffs' expectation that they would receive underinsured motorist protection in the event either was ever injured by an uninsured or underinsured driver. Turano also never told plaintiffs that Nationwide would deny any UIM claims made on the policy in the event that Mr. Decker was injured in the scope of his employment in the state police car. Likewise, Mr. Turano never offered to sell Mr. Decker a supplemental policy of insurance that would void the regular use exclusion, even though he knew that plaintiff Mr. Decker's employment *required* him to drive

a vehicle owned by the Commonwealth of Pennsylvania on a regular basis as a mandatory condition of Mr. Decker's employment.

## PROCEDURAL HISTORY

On May 10, 2005, Plaintiffs commenced this action by filing a complaint in the Court of Common Pleas of Lackawanna County. The parties filed subsequent pleadings which are not discussed here. Plaintiffs filed a second amended complaint on April 3, 2006 to caption 05 CV 1863. The counts of the second amended complaint are as follows:

Count I—Declaratory judgment—*John and Cara Decker v. Nationwide Insurance Company*

Count II—Negligence—*John and Cara Decker v. Nationwide Insurance Company*

Count III—Negligence—*John and Cara Decker v. Robert G. Turano Insurance Agency Inc.*

Defendant Nationwide filed a motion for summary judgment in response to plaintiffs' second amended complaint at 05 CV 1863 on May 30, 2006. Plaintiffs responded on September 7, 2006.[2]

## DISCUSSION

Several issues with their corresponding arguments are presented to this court for disposition. Sections 1 and 2

---

2. We note that defendant Robert G. Turano Insurance Agency Inc. filed a motion for summary judgment to caption 05 CV 1863 on October 5, 2006. Said motion is not considered here because it is not yet ripe.

of this opinion provide the legal standards governing motions for summary judgment and declaratory judgment, respectively. Section 3 of this opinion discusses UM/UIM coverage as mandated by the Pennsylvania Motor Vehicle Financial Responsibility Law (Pa. MVFRL), and its applicability to the instant disposition. Issues embedded in contract law are addressed in section 4, including analysis of the reasonable expectations of the insured and unconscionability. In section 5, we review public policy considerations presented in the unique set of facts of this case, with particular focus on the treatment of first responders elsewhere under the law of this Commonwealth. The final section of this opinion, section 6, focuses on defendants' argument that the gist of the action doctrine governs Count II of plaintiffs' complaint in negligence.

## 1. *Summary Judgment Standard*

Before the court is defendants' motion for summary judgment. Rule 1035 of the Pennsylvania Rules of Civil Procedure provides the standard for summary judgment. Rule 1035.2 states:

"After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

"(1) whenever there is no genuine issue of material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

"(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury."

"Summary judgment may be granted only in those cases in which the record clearly shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Harleysville Insurance Companies v. Aetna Casualty and Surety Insurance Company,* 568 Pa. 255, 258, 795 A.2d 383, 385 (2002) citing *P.J.S. v. Penn State Ethics Commission,* 555 Pa. 149, 153, 723 A.2d 174, 176 (1999). "A material fact is one that directly affects the outcome of the case." *Kuney v. Benjamin Franklin Clinic,* 751 A.2d 662, 664 (Pa. Super. 2000). (citation omitted) "[T]he trial court will determine the question of whether there is a genuine issue as to any material fact." *Hibbs v. Chester-Upland School District,* 146 Pa. Commw. 556, 564, 606 A.2d 629, 633 (1992) citing *Penn Center House Inc. v. Hoffman,* 520 Pa. 171, 553 A.2d 900 (1989).

"On this critical question, the party who brought the motion has the burden of proving that no genuine issue of fact exists." *Id.* "As with all summary judgment cases, the court must examine the record in the light most favorable to the non-moving party and resolve all doubts against the moving party as to the existence of a triable issue." *McCarthy v. Dan Lepore & Sons Co. Inc.,* 724 A.2d 938, 940 (Pa. Super. 1998). (citation omitted)

"Interpretation of an insurance policy is a question of law that a court may resolve on a motion for summary judgment." *Harleysville Insurance Companies v. Aetna Casualty and Surety Insurance Company,* 568 Pa. at 258, 795 A.2d at 385, citing *Harstead v. Diamond State Insurance Co.,* 555 Pa. 159, 162-63, 723 A.2d 179, 180 (1999).

## 2. Declaratory Judgment

Declaratory judgment actions are governed by 42 Pa.C.S. §7532:

"Courts of record, within their respective jurisdictions, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect, and such declarations shall have the force and effect of a final judgment or decree."

"In a declaratory judgment action, just as in civil actions generally, '[s]ummary judgment may be granted only in those cases in which the record clearly shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.' " *Hydropress Environmental Services Inc. v. Township of Upper Mount Bethel,* 575 Pa. 479, 489, 836 A.2d 912, 918 (2003). (citations omitted) Having identified the procedural mechanisms defendant's instant motion presents, we consider the substantive law applicable to the dispute at hand.

### 3. *The MVFRL Mandates that Insurers Offer UM/UIM Coverage*

The purpose of the UM/UIM coverage was provided in *Wolgemuth v. Harleysville Mutual Insurance Co.,* 370 Pa. Super. 51, 58, 535 A.2d 1145, 1149 (1988):

"The purpose of underinsured motorist coverage is to protect the insured (and his additional insureds) from the risk that a negligent driver of another vehicle will cause injury to the insured (or his additional insureds) and will have inadequate liability coverage to compensate for the injuries caused by his negligence." (quoting *Myers v. State Farm Mutual Automobile Insurance Co.,* 336 N.W.2d 288, 291 (Minn. 1983)).

The Pa.MVFRL mandates that insurers offer UM/UIM coverage and make it available to insureds; the statute requires individuals to sign a waiver indicating their choice to opt out of UM/UIM coverage. 75 Pa.C.S. §1731.[3] Accordingly, the legislature, in insisting that UM/UIM coverage be made available yet optional, considered said coverage important enough to require a written rejection of such UM/UIM coverage. The rule governing statutory construction guides us in reconciling the contradiction between the language of 75 Pa.C.S. §1731 and the ability of the defendant to insert the regular use exclusion into plaintiff's policy. Statutory interpretation is governed by 1 Pa.C.S. §1921:

"Legislative intent controls

"(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of

---

3. The language of 75 Pa.C.S. §1731 is provided *supra* at 149-51.

the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.

"(b) When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit. . . ."

Here, the plain, unambiguous language of 75 Pa.C.S. §1731 imposes a mandatory requirement on defendants to obtain an insured's signature if opting-out of UM/UIM coverage. *The overwhelming impact of the regular use exclusion inserted by the insurer without adequately informing this insured of the consequence enables the defendants to seemingly comply with the statute, yet simultaneously circumvent the statutory duty to provide UM/UIM coverage to the insured who chooses to elect such coverage.* This eviscerates the UM/UIM coverage for the overwhelming amount of time that the insureds spend in a motor vehicle. Gutting an insured's UM/UIM coverage without the written rejection required per 75 Pa.C.S. §1731 is a clear, palpable violation of both the statute's letter and its spirit.

### (a) Enabling Insurance Companies To Effectively Void UM/UIM Coverage by Inserting a Regular Use Exclusion Allows Insurance Providers To Eviscerate the Requirements of the Pa.MVFRL

Attempting to reconcile two conflicting circumstances, namely (1) the statutory mandate that an insured must opt-out of UM/UIM coverage by signature, with (2) an insurer's ability to effectively void huge portions of UM/ UIM coverage with minimal, marginal notification not

ratified by signature, understandably presents a clearly contradictory result. In fact, it seems patently contradictory and counterintuitive to the legislative protections written into the Pa.MVFRL which require rejection of UM/UIM coverage in writing. To allow such shallow notice as here with a multi-page summary of changes document, to effectively circumvent the majority of the statutory scheme that must be met only by an individual's written rejection of the UM/UIM coverage by signature would be a travesty laying waste to the legislatively mandated requirements made to protect the insureds. Of further significance is the language of 75 Pa.C.S. §1731(c.1), *"On policies in which either uninsured or underinsured coverage has been rejected, the policy renewals must contain notice in prominent type that the policy does not provide protection against damages caused by uninsured or underinsured motorists."* (emphasis added) Interestingly, under 75 Pa.C.S. §1731(c.1), an insurer is obligated to continually remind an insured who rejects UM/UIM coverage of the insured's decision to decline UM/UIM coverage. And yet, in the case sub judice, defendants effectively strip an insured of the lion's share of the requested and purchased UM/UIM coverage through the regular use exclusion without having to provide "prominent type" notice that would serve the same purpose of the notification language of 75 Pa.C.S. §1731(c.1), *supra.* Again, the statutory language requires an insurer, at each policy renewal, to remind an insured who declines to purchase the UM/UIM coverage of the insured's decision to drive without this coverage. Also, the need for a prior written rejection of UM/UIM coverage was noted *supra,* at pages 149-51.

Similarly problematic is the fact that the proffered, unilaterally-inserted regular use exclusion guts coverage for those frequently behind the wheel of a vehicle (*i.e.,* as here, for the duration of plaintiff John Decker's workday) of UM/UIM coverage. We therefore determine that the regular use exclusion effectively suspends the great majority of UM/UIM coverage for the insured employee whose office is his employer-owned vehicle and whose workday is on the road. Permitting an insurance company to insert such a regular use exclusion in an insured employee's motor vehicle policy without consent or meaningful notification to the insured enables an insurer to thwart the statute and its scheme to protect insureds. This consequence is glaringly obvious, as here, where the insured specifically requested such UM/UIM coverage pursuant to 75 Pa.C.S. §1731, but was not provided the same. Resultantly, insurers are provided with a perverted, incongruous mechanism through which they may simultaneously both comply with and validly avoid their statutory mandate. To allow insurers to conduct business in such a fashion is to provide insurers with a path through which they may largely circumvent the statutory scheme. Therefore, we conclude and hold such a regularly-used, non-owned motor vehicle exclusion in violation of the Pa.MVFRL statutory scheme and therefore, null, void and illegal as against stated legislative statute and public policy.

Our analysis of this problem could conclude here but does not, as tenets of contract law provide additional insight into the situation before us.

## 4. *Issues of Contract*

Regular use exclusions that limit UM/UIM coverage on certain vehicles, like that in plaintiffs' policy, have been held valid under Pennsylvania law. See *Prudential Property & Casualty Insurance Co. v. Gisler,* 569 Pa. 573, 806 A.2d 854 (2002); *Burstein v. Prudential Property & Casualty Insurance Co.,* 570 Pa. 177, 809 A.2d 204 (2002); *Prudential Property & Casualty Insurance Co. v. Hinson,* 277 F. Supp.2d 468 (E.D. Pa. 2003); *State Farm Mutual Automobile Insurance Co. v. Brnardic,* 441 Pa. Super. 566, 657 A.2d 1311 (1995). There are distinguishing facts in the present case that prevent this court from adopting the reasoning of the prior precedent determining issues involving those similar clauses in other policies. We are mindful of the potential for error in applying factually-distinct, prior precedent blindly. Instead, we herein examine the various decisions that have required courts to parse the language of policies and scrutinize the particulars in such agreements.

"Generally, courts must give plain meaning to a clear and unambiguous contract provision unless to do so would be contrary to a clearly expressed public policy."[4] *Pa. National Mutual Casualty Co. v. Black,* 591 Pa. 221, 237, 916 A.2d 569, 578 (2007), citing *Prudential Property & Casualty Insurance Co. v. Colbert,* 572 Pa. 82, 813 A.2d 747 (2002). *Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. 300, 304-305, 469 A.2d 563, 566 (1983) provided the traditional rules governing the interpretation of insurance contracts:

---

4. Public policy concerns are addressed separately, *infra.*

"The task of interpreting a contract is generally performed by a court rather than by a jury. . . . The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. . . . Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. . . . Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language." (citations omitted)

In *Standard Venetian Blind,* an insured (who had not read his insurance policy) sought coverage under an insurance policy; the insurance company argued policy exclusions barred the insured's recovery. *Id.* at 303, 469 A.2d at 565. The court found that the language of the policy functioned as the binding agreement memorializing the terms between the parties. *Id.* at 305, 469 A.2d at 566. Its reasoning, in looking to terms of the written contract rather than examining the verbal exchange of negotiations that occurred prior to the agreement, was provided as follows:

"By focusing on what was and was not said at the time of contract formation rather than on the parties' writing, *Hionis* makes the question of the scope of insurance coverage in any given case depend upon how a factfinder resolves questions of credibility. Such a process, apart from the obvious uncertainty of its results, unnecessarily delays the resolution of controversy, adding only unwanted costs to the cost of procuring insurance." *Id.* at 306, 469 A.2d at 567 (declining to follow *Hionis v. Northern Mutual Insurance Co.,* 230 Pa. Super. 511, 327 A.2d 363 (1974)).

The court carved out an exception to the absolute application of this standard, stating:

"Although on this record we reject *Hionis, we note that in light of the manifest inequality of bargaining power between an insurance company and a purchaser of insurance, a court may on occasion be justified in deviating from the plain language of a contract of insurance.* See 13 Pa.C.S. §2302 *(court may refuse to enforce contract or any clause of contract if a court as a matter of law deems the contract or any clause of the contract to have been 'unconscionable at the time it was made.').* *This record does not present such an occasion.* We hold only that where, as here, the policy limitation relied upon by the insurer to deny coverage is *clearly worded and conspicuously displayed,* the insured may not avoid the consequences of that limitation by proof that he failed to read the limitation or that he did not understand it." *Id.* at 307, 469 A.2d at 567. (emphasis added) See also, *Bishop v. Washington,* 331 Pa. Super. 387, 398, 480 A.2d 1088, 1093 (1984).

In considering the characteristics unique to insurance contracts and policies, it is proper for a reviewing court to determine issues of fact unique to the subject dispute. This is so the court may discern whether the language of the policy indeed controls or whether the clause is "unconscionable" or not "conspicuously displayed" and the record presents such an occasion for a court to refuse to enforce the contract clause.

The Supreme Court considered the applicability of the *Standard Venetian Blind* holding in *Tonkovic v. State Farm Mutual Automobile Insurance Co.,* 513 Pa. 445,

521 A.2d 920 (1987). *Tonkovic* presented the issue of whether an exclusionary clause that was unilaterally inserted by the insurance company would apply to an insured who had not agreed to the exclusion, and in fact, expected full coverage under the policy. The court found for the insured, stating "where, as here, an individual applies and prepays for specific insurance coverage, *the insurer may not unilaterally change the coverage provided without an affirmative showing that the insured was notified of, and understood, the change, regardless of whether the insured read the policy.*"[5] *Id.* at 455, 521 A.2d at 925. (emphasis added)

The court directed the judiciary to be mindful of characteristics unique to the insurance industry:

"Courts should also keep alert to the fact that the *expectations of the insured are in large measure created by the insurance industry itself.* Through the use of lengthy, complex and cumbersomely written applica-

---

5. The *Tonkovic* court clarified its holding in *Standard Venetian Blind:*

"Thus, *we made it clear that our holding was not to be mechanically applied without regard to the factual context in which the claim arose. Venetian Blind* is simply not applicable to the facts of the instant case. . . . We find a crucial distinction between cases where one applies for a specific type of coverage and the insurer unilaterally limits that coverage, resulting in a policy quite different from what the insured requested, and cases where the insured received precisely the coverage that he requested but failed to read the policy to discover clauses that are the usual incident of the coverage applied for. When the insurer elects to issue a policy differing from what the insured requested and paid for, there is clearly a duty to advise the insured of the changes so made. The burden is not on the insured to read the policy to discover such changes, or not read it at his peril." 513 Pa. at 453-54, 521 A.2d at 924-25. (emphasis added)

tions, conditional receipts, riders, and policies, to name just a few, the insurance industry forces the insurance consumer to rely upon the oral representations of the insurance agent. Such representations may or may not accurately reflect the contents of the written document and therefore the insurer is often in a position to reap the benefits of the insured's lack of understanding of the transaction." *Id.* at 456, 521 A.2d at 926, (emphasis added) citing *Collister v. Nationwide Life Insurance Co.,* 479 Pa. 579, 594-95, 388 A.2d 1346, 1353-54 (1978).

We find the rule set forth in *Tonkovic* applicable to the disposition of the instant facts before us. This does not end our inquiry, as the insureds' reasonable expectations are also an element in the analysis.

(a) Reasonable Expectations of the Insured

"According to Pennsylvania law, 'the proper focus for determining issues of insurance coverage is the reasonable expectations of the insured.' " *Prudential Property and Casualty Insurance Co. v. Hinson,* 277 F. Supp.2d 468, 476. (citations omitted) The court stated:

"In most cases, the parties' reasonable expectations are best evidenced by the language of the insurance policy. . . . Even so, a court must examine the totality of the insurance transaction at issue to ascertain the reasonable expectations of an insured individual. . . . The clearest of exclusions will not bind an insured where an insurer or its agent has created a reasonable expectation of coverage, and coverage may exist based upon any other

reasonable expectations of an insured." *Id.* at 476. (citations omitted)

*Hinson* concerned the situation of a part-time police officer who sought UM/UIM coverage following an accident he had while driving one of the police cruisers at his disposal. Like the instant case, in *Hinson,* the insured's policy included a regular use exclusion. The district court, noting the factual distinctions between the Pennsylvania Supreme Court's holdings in both *Tonkovic* and *Standard Venetian Blind,* determined that the language of the insurance policy governed the agreement between the parties: "We therefore decline to extend coverage based upon Pennsylvania's reasonable expectations doctrine, *contrary to the clear terms of the policy.*" *Id.* at 477. (emphasis added)

Our case is distinguishable from the facts in *Hinson.* The instant case presents issues of defendants' failure to adequately inform plaintiffs that material and substantial changes had been made to plaintiffs' policy only shortly before the underlying accident. The plaintiffs requested, purchased, received, and continued to expect UM/UIM coverage as represented to them by the fully-informed defendants. The exclusionary terms are neither conspicuous nor clear. We consider these facts in light of a recent decision authored by the Superior Court.

In *Beck-Hummel v. Ski Shawnee Inc.,* 902 A.2d 1266 (Pa. Super. 2006), plaintiff had been injured while snow tubing. A release of liability for the resort was located on the back of the plaintiff's admission ticket for the activity which became the event of the injury. The court

conducted an extensive factual examination of the purchase transaction and the appearance of the ticket. The court found the release unenforceable:

"Under the circumstances of this case, where it is undisputed that neither the purchaser nor user of the ticket read its language, and where the language of the ticket itself is not so conspicuous as to, without more, put the user/purchaser on notice, we cannot conclude as a matter of law that the disclaimer is enforceable." *Id.* at 1275. (footnote omitted) (citations omitted)

We find the facts of *Beck-Hummel v. Ski Shawnee Inc.* analogous to the instant case. Here, language binding the plaintiffs was inconspicuously buried in a six-page document that contained many other confusing changes of various topics, all binding on the plaintiffs. Meanwhile, verbal representations to the contrary had been made to the plaintiffs by their agent, defendant Turano, regarding the extent of plaintiffs' coverage. The record is clear that plaintiffs considered themselves to have received continued UM/UIM coverage in the nature they had requested and had been originally provided upon purchase. The unilateral restriction of the UM/UIM benefits due to the insertion of the recent regular use exclusion with notification buried in the six-page list of boilerplate amendments to the policy was insufficient to inform the plaintiffs of the policy's change because said notifications were not conspicuous as per *Beck-Hummel, supra,* nor were they clearly stated as per *Hinson, supra.*

Accordingly, being ill-informed of the exclusion, the plaintiffs were unable to accept it. It is therefore proper to deny defendant's motion for summary judgment as to

declaratory judgment of the plaintiffs' complaint since factual issues regarding proper notification and acceptance by the insureds are resplendently present which scream for a jury's determination.

### (b) Unconscionability

We are cognizant of the theory of unconscionability as it relates to contracts:

"'Unconscionability' has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms that are unreasonably favorable to the other party. Thus, unconscionability has two parts. First, for a contract or term to be unconscionable, the party signing the contract must have lacked a meaningful choice in accepting the challenged provision. Second, the challenged provision must unreasonably favor the party asserting it.

"Whether a contract or clause is unconscionable is a question of law for the court." 16 Summ. Pa. Jur. 2d Commercial Law §1:100. (footnotes omitted) Pennsylvania statutory law provides the following at 13 Pa.C.S. §2302,

"*Unconscionable contract or clause:*

"(a) *Finding and authority of court.*—If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made, the court may:

"(1) refuse to enforce the contract;

"(2) enforce the remainder of the contract without the unconscionable clause; or

"(3) so limit the application of any unconscionable clause as to avoid any unconscionable result.

"(b) *Evidence by parties.*—When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

The Superior Court discussed two concepts of unconscionability in *Germantown Manufacturing Co. v. Rawlinson,* 341 Pa. Super. 42, 57, 59, 491 A.2d 138, 146, 147 (1985), "The first concept of unconscionability which we shall examine may be classified under the rubric of *'unfair surprise.'*[6] ... The second concept of unconscionability which we shall examine concerns clauses wherein there is *apparent* but not *genuine* assent."[7] (emphasis in original)

---

6. The Superior Court further explained "unfair surprise:

"This type of unconscionability involves contractual terms *which are not typically expected by the party who is being asked to 'assent' to them.* An unexpected clause often appears in the boilerplate of a printed form and, if read at all, is often not understood. By signing such a form, a party is bound only to those terms which such party would reasonably expect such a printed form to contain. *If the form contains a material, risk-shifting clause* which the signer would not reasonably expect to encounter in such a transaction, courts have held that the clause may be excised as it is unconscionable." 341 Pa. Super. at 57-58, 491 A.2d at 146. (emphasis added) (citation omitted)

7. The court presented a hypothetical to elaborate on assent:

"The party who requires goods or services important to his physical or economic well-being may have little or no choice but apparently to assent to the terms of a printed form dictated by the party with superior bargaining power. Even where other sources of supply are available, there may be conscious parallelism resulting in virtually identical

Unconscionability provisions of the Uniform Commercial Code have been held to apply to contracts of insurance. ("[I]t has been held that the sale of insurance and contracts of insurance are within the scope of the unconscionability section of the Uniform Commercial Code." *Bishop v. Washington,*[8] 331 Pa. Super. 387, 398-99, 480 A.2d 1088, 1093-94 (1984) (citations omitted)). The *Bishop* court acknowledged definition of unconscionability as amorphous, but provided the following definition, "Unconscionability has generally been recognized to include an *absence of meaningful choice* on the part of one of the parties together with contract *terms which are unreasonably favorable to the other party." Id.* at 400, 480 A.2d at 1094 (emphasis in original) (citing *Witmer v. Exxon Corp.,* 495 Pa. 540, 551, 434 A.2d 1222, 1228 (1981), quoting *Williams v. Walker-Thomas Furniture Co.,* 350 F.2d 445 (D.C. Cir. 1965)). "Insurance contracts are generally viewed as contracts of 'adhesion'. Under such a contract, the parties are usually not of equal bargaining power and the buyer must adhere to the terms of a form contract which are not negotiable." *Id.* (citations omitted)

---

printed forms offered by all available suppliers. The phrase "contract of adhesion" and the evil it suggests have been familiar for many years. The terms of these contracts do not surprise the weaker party because they were read and understood—perhaps even explained by the dictatorial supplier. *Assent and volition and, therefore, agreement are absent."* 341 Pa. Super. at 59, 491 A.2d at 147. (emphasis added)

8. We note that a portion of *Bishop v. Washington* has been abrogated by the United States Federal District Court for the District of New Jersey in *UTI Corp. v. Fireman's Fund Ins. Co.,* 896 F. Supp. 362 (D.N.J. 1995) on another point of law. In this case, we turn to *Bishop* for guidance on the issue of unconscionability only.

The *Bishop* court shifted its scope to consider factual issues of the policy in dispute. Directives for interpreting were provided:

"The language of a contract clause which limits liability coverage must be clear and precise in order to prevent unfair surprise. . . . The insurance policy involved in this case is a 'plain talk' policy, written in understandable, straight-forward language. The 'other insurance' provision is a conspicuously labeled, bold-type sub-section listed under a larger bold-type heading entitled 'limits of payment.' *This is not a case where an exclusion from coverage that defeats the reasonable expectations of the insured is buried in fine print deep in the insurance contract.*" *Id.* at 401, 480 A.2d at 1095. (emphasis added) (citations omitted)

Thus, the court recognized the scenario in which alterations to a policy may not be obvious to the insured, thereby strengthening our decision to deny defendants' motion for summary judgment.

### 5. *Public Policy*

Another element for consideration by the court in review of this case is defendants' regular use exclusion which operates as a denial of the UM/UIM coverage to a Pennsylvania State Trooper and first responder. This is a critically important aspect of public policy. Recently, the Pennsylvania Supreme Court decision in *Pa. National Mutual Casualty Co. v. Black,* 591 Pa. 221, 916 A.2d 569 (2007) explained the court's view of when contractual terms conflict with public policy. The court provided:

" 'Generally, courts must give plain meaning to a clear and unambiguous contract provision unless to do so would be contrary to a clearly expressed public policy.' ... In recent years, the court has addressed several claims that unambiguous provisions in automobile insurance policies are unenforceable because they violate public policies expressed in or underlying the MVFRL. *In response, we have repeatedly emphasized our reticence to throw aside clear contractual language based on 'the often formless face of public policy.'* ...

"Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy. ... Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the court should not assume to declare contracts . . . contrary to public policy. The courts must be content to await legislative action." *Id.* at 578-579 (emphasis added) (citing *Prudential Property & Casualty Insurance Co. v. Colbert,* 572 Pa. 82, 90, 813 A.2d 747, 752 (2002); *Burnstein v. Prudential Property and Casualty Insur. Co.,* 570 Pa. 177, 182, 809 A.2d 204, 207 (2002); *Eichelman v. Nationwide Insurance Co.,* 551 Pa. 558, 563, 711 A.2d 1006, 1008 (1998)).

We are mindful of the consequences of voiding a contract's clause considered in light of the Supreme Court's decision. Fundamentally, the very foundations of contract

law enable parties to form binding agreements among themselves, free from judicial intervention. Generally, it is desirable to have these agreements be as stable and predictable as possible. Cases where contractual terms are discussed, contemplated, and negotiated before the parties choose to assent to the terms are distinguishable from those cases in which one party has more influential decision-making power over the other. It is beyond cavil that in contract law there must be an offer communicated to and understood by the other party who then, with knowledge, either accepts the same, making the contract binding, or rejects it, thereby preventing a contract or a contract clause's formation.

We do not find the parties before us of equal bargaining power, especially regarding the surreptitious changes to the insurance policy at issue. Further, we do not find the actions of the defendants largely excluding the terms of UM/UIM coverage from the plaintiffs by means of a "summary of changes" document valid. The plaintiffs received verbal representations of UM/UIM coverage to the contrary, and given that plaintiff John Decker's compulsory use of a non-owned vehicle (state police cruiser) was known to the agent, defendant Turano, plaintiff did not receive that for which he bargained.

Also, there was no written rejection of UM/UIM coverage, nor policy notification of the same, all despite the overwhelming loss of coverage to the plaintiff. Under these facts and circumstances, the original bargained-for exchange struck regarding UM/UIM coverage is controlling and the updated exclusion is clearly lacking in knowledge, assent and volition from the insured. Most significantly, we find it appalling that a first responder,

who specifically requested UM/UIM coverage from his carrier, was surreptitiously denied the same as a result of a unilateral action by the insurance provider. The court notes that a factually-similar case was decided in *Prudential Property & Casualty Ins. Co. v. Hinson,* 277 F. Supp.2d 468.[9] In *Hinson,* the district court found that the regular use exclusion in the part-time police officer insured's policy, denying UM/UIM coverage was valid. "The court also finds it highly unlikely that Prudential would have willingly written the policy for defendants to include the frequent use of a police vehicle used to pursue traffic law violators at high speeds." *Id.* at 477.

We understand the *Hinson* court's rationale. We find it disturbing, however, that first responders, who are widely exposed to grave physical dangers by the very nature of their occupation and *required* to operate their employer's motor vehicle within the scope of their employment and occupation, should be susceptible to unilateral changes to their insurance policy. Further, these changes would virtually negate the UM/UIM protection in coverage they purchased, and then subsequently had gutted by the invidious insertion of a non-owned, regularly-used motor vehicle exclusion.

Equally disturbing is the broad-based possibility that the quiet insertion of a regular use exclusion functioning to limit an insured's UM/UIM coverage, as done here, might occur to any firefighter, police officer, sheriff, ambulance driver, volunteer firefighter, utility-worker, refuse-collector, delivery person for UPS, DHL or FedEx, teamster, on-the-road trucker, cabbie, bus driver, this list

---

9. Discussed, *supra,* at 168-69.

could go on, who works to protect and improve the community, as well as conduct business here. More directly to the case sub judice is the existence of other laws of this Commonwealth that afford greater protection to our first responders and show legislative intent to do so despite, no because of, their potentially hazardous duty.

### (a) The Law Provides First Responders with Preferential Treatment

The consequence of the regular use exclusion functioning to void the coverage for plaintiff John Decker seems particularly contradictory and counterintuitive when noting that protections are afforded to first responders elsewhere under Pennsylvania law. Specifically, the Heart and Lung Act, 53 P.S. §637, mandates that certain categories of employees, including members of the state police force, are entitled to compensation if injured in the course of employment. Stated in the Heart and Lung Act, "Any member of the state police force . . . who is injured in the performance of his duties . . . and by reason thereof is temporarily incapacitated from performing his duties, shall be paid by the Commonwealth of Pennsylvania . . . until the disability arising therefrom has ceased." 53 P.S. §637(a). The Heart and Lung Act further provides:

"In the case of the state police force . . . diseases of the heart and tuberculosis of the respiratory system, contracted or incurred by any of them after four years of continuous service as such, and caused by extreme overexertion in times of stress or danger or by exposure to heat, smoke, fumes or gases, arising directly out of the employment of any such member of the state police force

. . . shall be compensable in accordance with the terms hereof; and unless any such disability shall be compensable under the compensation laws as having been caused by accidental injury, such disability shall be compensable as occupational disease disabilities are presently compensable under the compensation laws of this Commonwealth. It shall be presumed that tuberculosis of the respiratory system contracted or incurred after four consecutive years of service was contracted or incurred as a direct result of employment." 53 P.S. §637(b).

The Heart and Lung Act provides protection for first responders who sustain health problems arising from the nature of their employment. Clearly the law contemplates that our first responders are entitled to special protections. It is curious, then, to have some legislative statutes express an intent to afford such great protection for the health of first responders, while other legislative enactments are circumvented. This potentially allows this same category of protected persons to possibly remain exposed without adequate UM/UIM insurance that would compensate them for personal injury sustained during the course and scope of employment. Permitting the regular use exclusion limiting UM/UIM coverage in plaintiffs' policy would function to enable the Pa.MVFRL to conflict with other protections the legislature chose to enact to protect the Commonwealth's first responders.

## 6. Negligence and Gist of the Action Doctrine

The second prong of defendant Nationwide's motion for summary judgment concerns whether the "gist of the action doctrine" bars plaintiffs' claim of negligence

against defendant Nationwide. The "gist of the action doctrine" is explained: "[g]enerally, the doctrine is designed to maintain the conceptual distinction between breach of contract claims and tort claims. . . . As a practical matter, the doctrine precludes plaintiffs from recasting ordinary breach of contract claims into tort claims." *eToll Inc. v. Elias/Savion Advertising Inc.,* 811 A.2d 10, 14 (Pa. Super. 2002). (citations omitted) "[C]ourts have held that the doctrine bars tort claims (1) 'arising solely from a contract between the parties' . . . (2) where 'the duties allegedly breached were created and grounded in the contract itself' . . . (3) where 'the liability stems from a contract' . . . or (4) where the tort claim 'essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.'" *Id.* at 19. (internal citations omitted) "The question of whether the gist of the action doctrine applies is an issue of law subject to plenary review." *Id.* at 15. (citation omitted)

Defendant argues that the gist of the action doctrine bars the plaintiffs' claim of negligence because the relationship between the parties initiated through a contract. Conversely, plaintiffs argue the parties do not dispute issues of the contract, but rather, the failure on the part of the agent to fulfill his duty to procure a proper policy of insurance in accordance with the plaintiffs' essential needs, requests and expectations. Stated as this court interprets it, plaintiffs' position is that the negligence occurred as a result of the representations made by the agent, who had a duty to properly assess the needs, goals and requests of the plaintiffs regarding their insurance coverage, and communicate whether the policy met the

expectations of the plaintiffs as communicated to the agent.

We find plaintiffs' argument persuasive. While a contract in the form of an insurance policy is most definitely present in this case, it is obvious that a duty exists on the part of an agent to properly assess the stated goals of an insured and locate a policy with provisions that will match the same, and if the policy does not, to clearly state the shortfall of the policy to the insureds. Therefore, we deny defendant's motion for summary judgment as to plaintiffs' claim of negligence by the agent.

Considering all of the arguments in totality, we find that defendants' motion for summary judgment is denied for the reasons stated herein. An appropriate order, therefore, follows.

## ORDER

And now, April 16, 2007, defendant Nationwide's motion for summary judgment is dismissed and denied.